**RAPID–AMERICAN CORPORATION and McCrory Parent Corp., Respondents Below, Appellants/Cross–Appellees,**

v.

**David HARRIS, Leeburn Securities Limited, Cede & Co., Curt Rothschild, Naomi Weiss, Bastion Management Ltd., Bastion Fund—1980 L.P., Sea Venture International L.P., Cordoba Investment Ltd., and 398737 Ontario Ltd., Petitioners Below, Appellees/Cross–Appellants.**

Supreme Court of Delaware.

Submitted: May 21, 1991.
Decided: Jan. 23, 1992.

William O. LaMotte, III and Robert J. Valihura, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Jeffrey R. Mann (argued), Tab K. Rosenfeld (Rubin, Baum, Levin, Constant & Freidman, New York City, of counsel), for appellants/cross-appellees.

Stuart B. Young and Bruce L. Silverstein, Young, Conaway, Stargatt & Taylor, Wilmington, Eliot Lauer (argued), Benard V. Preziosi, Jr. (Curtis, Mallet–Prevost, Colt & Mosle, New York City, of counsel), for appellees/cross-appellants.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

MOORE, Justice.

This consolidated appeal challenges the results of a statutory appraisal of Rapid–American Corporation ("Rapid") which awarded certain dissenting shareholders $51.00 per share. On January 31, 1981, Rapid and R.K. Holding Corporation merged into Kenton Corporation ("Kenton"). After the merger, Rapid was transformed into a privately-held corporation. Meshulam Riklis and his family acquired 60% of Rapid through his controlling interest in Kenton. Carl H. Lindener, Riklis' partner, obtained the other 40% of Rapid's shares through his controlling interest in American Financial Corporation ("AFC").

Appellees and cross-appellants ("Harris"), owned 58,400 shares of Rapid before the merger. Harris brought a statutory appraisal action pursuant to 8 *Del.C.* § 262, contesting the merger consideration. The merger price included cash. and securities worth approximately $28.00 per share. After a trial in the Court of Chancery, the court awarded Harris $51.00 per share plus simple interest. *See Harris v. Rapid American Corp.*, Del.Ch., C.A. No. 6462, Chandler, V.C., slip op. at 43, 1990 WL 146488 (Oct. 2, 1990).

Rapid now challenges the trial court's decision to award Harris $51.00 per share. It claims that the results of the appraisal are unrealistic because the $51.00 award represents a 200% premium over Rapid's unaffected market price at the time of the merger. Rapid maintains that the trial court's error was the result of its decision to adopt Harris' valuation technique. Rapid claims that Harris' appraisal methodology violated Delaware law.

Harris further claims that the trial court erred when it failed to include a "control premium" in its valuation of Rapid. Harris

argues that the inclusion of a "control premium" was necessary to compensate Rapid's shareholders for their 100% ownership in three operating subsidiaries. Harris also challenges the award of simple interest. He urges us to adopt a "rule" presumptively requiring the trial court to award only compound interest pursuant to 8 *Del.C.* § 262(i).

After carefully examining the record, we affirm the trial court's decision to adopt Harris' valuation technique. Harris' methodology does not contravene Delaware law. We also affirm the trial court's decision to award Harris simple interest. The unambiguous statutory language of 8 *Del.C.* § 262(i) gives a court broad discretion to award either compound or simple interest. We reject any attempt to artificially fashion a "rule" upsetting the legislature's clear intent.

Finally, we reverse the denial of a "control premium" to Harris. We find that the trial court had an affirmative duty to consider the nature of the enterprise as an element of its valuation. Rapid, as a parent company owning a 100% interest in three valuable subsidiaries, was entitled to an adjustment of its inherent value as a going concern to reflect the economic reality of its structure at the *corporate level.* The valuation technique the trial court applied artificially discounted Rapid's ownership interest in its subsidiaries and deprived *all* of Rapid's shareholders of fair value.

We decline, however, to consider Harris' claim that the inclusion of the "control premium" merited an adjustment of Rapid's fair value to $73.28 per share. Instead we remand this case back to the Court of Chancery for a recalculation of Rapid's fair value. The trial court should consider the "control premium," together with all traditional "relevant factors," to determine if Harris is entitled to anything more than his original $51.00 per share award.

## I.

The underlying facts of this case are not in serious dispute. Rapid was a publicly-held conglomerate receiving 99% of its net sales and most of its operating profits from three wholly-owned subsidiaries. These subsidiaries included the McCrory Corporation ("McCrory"), Schenley Industries, Inc. ("Schenley"), and McGregor–Duniger, Inc. ("McGregor"). Rapid and each subsidiary had a full and distinct set of executives and operating officers. All of the subsidiaries maintained independent financial reports and records.

McCrory was Rapid's largest subsidiary. It was responsible for over half of Rapid's net sales and operating profits. McCrory was basically a retailing company owning such well-known subsidiaries and divisions as Lerner Shops, McCrory, and J.J. Newberry Stores. McCrory also held interests in other retailing and merchandising operations.

Schenley, Rapid's second largest subsidiary, was a distiller, importer and distributor of alcoholic spirits. It generated approximately 25% of Rapid's net sales and operating profits. Finally, McGregor was Rapid's smallest subsidiary. A clothing manufacturer and distributor, it generated less than 1% of Rapid's net sales and operating profits.

Rapid, as a whole, was burdened with a significant amount of debt before the merger. It was capitalized with close to 75% in long-term and short-term debt. Prior to the merger, Rapid carried the debt at market value instead of its face amount and book value. Apparently, the market value of Rapid's debt was deeply discounted because it was subject, at that time, to a significantly low rate of interest. At the parent level, Rapid also held certain valuable assets including a substantial art collection.

## A.

The merger transaction leading to the appraisal began in 1974. At that time, Riklis, Rapid's CEO and Chairman, began to purchase Rapid's shares in the open market through his interests in Kenton and AFC. Rapid also contemporaneously began to repurchase large blocks of its own shares. The repurchase program ultimate-

ly increased Riklis' control of Rapid's outstanding shares.

On April 11, 1980, Rapid announced that it had agreed to merge with Kenton into a newly reformed Rapid–American corporation. On the eve of the merger, Kenton and AFC controlled 46.5% of Rapid's outstanding stock. After the merger was effectuated on January 31, 1981, Rapid's shareholders received a compensation package worth approximately $28. The compensation included $45 principal in a newly-issued 10% sinking fund subordinated debenture, $3 in cash and an additional $.25. This nominal cash fee represented settlement consideration for certain pending derivative suits.

Rapid employed an independent Transaction Review Committee ("TRC") to evaluate the merger price. The TRC retained Bear Stearns & Co. to provide financial advice. The TRC also employed Standard Research Consultants ("SRC") to determine, among other things, the fairness of the proposed transaction to Rapid's shareholders. Arthur H. Rosenbloom, SRC's head consultant and expert witness at trial, led the investigation. The examination continued for approximately six months. SRC ultimately concluded that the $28.00 compensation package was fair to Rapid's shareholders.

SRC's valuation technique considered Rapid on a consolidated basis. It evaluated Rapid based on an analysis of earnings and dividends. *Harris*, slip op. at 7. SRC calculated price/earnings ratios for each subsidiary and adjusted its figures to include certain dividend ratios. It figured each subsidiaries' contribution to the parent's operating income for a set period of time to calculate Rapid's ultimate value. SRC then tested its figures against various established financial ratios of similarly situated corporations. *Id.*

Harris retained Willamette Management Associates, Inc. ("WMA") to evaluate the merger consideration. In contrast to SRC's technique, WMA separately evaluated each of Rapid's subsidiaries. WMA reasoned that its "segmented" approach to valuation was particularly appropriate be-

cause of the difficulty of finding a conglomerate comparable to Rapid.

The trial court carefully considered both the SRC and WMA analyses. The court rejected SRC's approach, ruling that WMA's "segmented" comparative valuation was more reliable. The court specifically noted that after considering the "voluminous" record, WMA's methodology was "by far the most reliable analysis presented in this appraisal action." *Harris*, slip op. at 21. The court found that SRC's evaluation suffered from a number of defects including its failure to consider that Rapid had adjusted its accounting techniques during the relevant time period. *Id.* at 7–18. The court also faulted SRC for its decision not to treat Rapid on a debt-free basis. *Id.* Finally, the court explicitly rejected SRC's valuation, and held that it violated Delaware law. *Id.* at 16. The court found that SRC's valuation technique "determined the value of [Harris'] shares as freely trading minority shareholders instead of considering Harris' proportionate (1.5%) [sic] interest in Rapid as a going concern...." *Id.*

The court adopted a modified version of WMA's valuation technique in a highly detailed, forty-three page opinion. It then ruled that Rapid's fair value at the time of the merger was $51.00 per share. *See id.* at 43. The trial court also awarded Harris 12.75% simple interest. *Id.*

### B.

The Court of Chancery adopted WMA's comparative analysis. *Id.* at 19. It examined each of Rapid's subsidiaries as a separate entity. *Id.* It then compared the subsidiaries to a group of comparable publicly-traded companies. *Id.*

WMA examined the financial statements of the subsidiaries and the comparables to develop certain pricing multiples. *Id.* at 20 These multiples were based on revenues, pre-interest and tax earnings, earnings "before depreciation, amortization, interest and taxes [and] tangible book value of invested capital...." *Id.* WMA specifically treated each subsidiary and comparable on

a debt-free basis in an effort to factor out the vagaries of "managerial discretion" and to treat the companies on a "level playing field." *Id.* The analysis yielded a market value of invested capital for each segment. *Id.* The trial court also considered an average of the subsidiaries' financials for the five years preceding the merger, but placed special emphasis on the twelve months before the merger. *Id.* at 20–21. After calculating the market value of invested capital for each segment, the court subtracted out the market value of all senior debt and preferred equity to calculate the value of each segment's common equity. *Id.* at 13, 21. The trial court also considered "various parent-level" factors. *Id.*

The Vice Chancellor rejected WMA's inclusion of a "control premium" in its final evaluation of each Rapid subsidiary. *Id.* at 21–22. It found that the addition of a "control premium" violated Delaware law. *Id.* at 29, 35, 38. The court reasoned that the "control premium" contravened the proscription against weighing factors affecting valuation "at the shareholder level." *Id.* at 29.

## II.

We now turn to the merits of Rapid's appeal. Rapid launches a complex and detailed attack on the trial court's decision to award Harris $51.00 per share. Despite its breadth, Rapid's argument ultimately reduces to one fundamental point. It maintains that the trial court erroneously relied on WMA's "segmented" valuation technique instead of employing SRC's methodology.

Rapid first claims that its valuation did not violate Delaware law and was more reliable than Harris' computation. It then proposes that WMA's valuation contravened Delaware law and improperly neglected to consider certain specific aspects of Rapid's financial structure. Rapid makes four specific arguments. It contends that: (1) WMA's valuation incorrectly included a "control premium"; (2) WMA's valuation was erroneously based upon a "break-up" or liquidation value of Rapid's

subsidiaries; (3) WMA only valued Rapid's subsidiaries and did not consider the value of the parent; and finally (4) WMA's valuation techniques only treated Rapid's debt at its market value and not at its book value.

Harris argues that WMA's technique was not violative of Delaware law. He maintains that WMA's valuation methodology was inherently more reliable.

### A.

We first note that the parties dispute the applicable standard of review. Rapid urges us to exercise *de novo* plenary review.

Rapid contends that the trial court committed legal error when it ruled that SRC's valuation contravened Delaware law. Rapid claims that the court misinterpreted the trial testimony of its expert, Rosenbloom, that SRC quantified Rapid as its "value to the minority shareholder representing a freely traded minority interest, with neither premium for control nor discount for lack of marketability or minority interest." Rapid also argues that the WMA analysis suffers from a number of fundamental defects. It concludes that the trial court must have contravened Delaware appraisal law by adopting WMA's supposedly flawed technique.

Harris maintains that we can only examine the record for an abuse of discretion. He characterizes the trial court's decision to adopt the modified WMA approach as a mixed question of law and fact. Harris concludes that the trial court's ultimate decision reflected a choice between the competing views of experts.

### 1.

■ We agree with Harris' assessment of the issues presented in this aspect of Rapid's appeal. Rapid's claim that the trial court committed legal error is unconvincing for two reasons. First, Rapid only argues that the court mistakenly thought that the SRC valuation applied a minority discount at the shareholder level. It only quarrels with the Vice Chancellor's interpretation of trial testimony. Rapid does

not recognize that Delaware law entrusts the assessment of trial witnesses in an appraisal action to the discretion of the fact-finder. *See Kahn v. Household Acquisition Corp.,* Del.Supr., 591 A.2d 166, 175 (1991); *Alabama By-Products Corp. v. Neal,* Del.Supr., 588 A.2d 255, 258–59 (1991); *Cavalier Oil Corp. v. Harnett,* Del. Supr., 564 A.2d 1137, 1146 (1989). We can only examine the trial judge's alleged failure to "understand" expert trial testimony in this case for an abuse of discretion. *Id.*

Second, Rapid implies that the court rejected its valuation solely because of the Vice Chancellor's supposed misinterpretation of Rosenbloom's testimony. Rapid's argument is somewhat disingenuous. The trial court explicitly stated that it rejected SRC's valuation for "several reasons." *Harris,* slip op. at 18. The court also noted that it accepted the WMA method because SRC's valuation did not treat Rapid on a debt free basis or make a LIFO/FIFO adjustment. *Id.* at 19.

Rapid's objection to the trial court's adoption of WMA's valuation also attacks the application of law to the facts. It does not follow, however, that a trial court commits legal error every time it adopts a view of the evidence contrary to that held by the losing party.

### 2.

■ It is well-settled that we accord "a high level of deference" to a trial court's determination of value in a statutory appraisal proceeding. *See Kahn,* 591 A.2d at 175; *Alabama By-Products,* 588 A.2d at 258–59; *Cavalier,* 564 A.2d at 1146. It is frequently the case in appraisal proceedings that valuation disputes become a battle of experts. *Id.* We have noted that the trial judge, as finder of fact in appraisal cases, enjoys the unique opportunity to examine the record and assess the demeanor and credibility of witnesses. *Id.* Accordingly, we will overturn an appraisal decision only if the trial court abused its discretion. *Id.* A court abuses its discretion in an appraisal proceeding when its factual

findings do not have record support and its valuation is not the result of an orderly and logical deductive process. *See Alabama By-Products,* 588 A.2d at 259 (citing *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972)).

### B.

We now turn to the specific merits of Rapid's appeal to determine whether the trial court abused its discretion. We first consider Rapid's claim that the court's "segmented" valuation technique violated Delaware law because it supposedly assessed Rapid's value on a liquidation basis instead of considering it as a going concern.[1] Rapid argues that the court's valuation approach was identical to the liquidation technique rejected in *Bell v. Kirby Lumber Corp.,* Del.Ch., 395 A.2d 730 (1978), *modified,* Del.Supr., 413 A.2d 137 (1980).

### 1.

We start with a brief overview of the law. It is now "axiomatic" that in a statutory appraisal proceeding, the dissenting shareholders are entitled to receive "fair value" representing their "proportionate interest in a going concern." *Cavalier,* 564 A.2d at 1144 (quoting *Tri-Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 72 (1950)). The court must consider "all relevant factors" to determine "fair value" exclusive of "post-merger events or other possible business combinations." *See* 8 *Del.C.* § 262(h); *Kahn,* 591 A.2d at 174; *Alabama By-Products,* 588 A.2d at 257–58; *Cavalier,* 564 A.2d at 1144; *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 713 (1983).

*Bell* best illustrates the law. Kirby Lumber Corporation ("Kirby"), the company subject to the appraisal in *Bell,* was a manufacturing concern primarily engaged in the production of lumber and plywood. *Bell,* 395 A.2d at 732. Kirby also held a vast acreage of timberland. *Id.* at 733.

---

**1.** We consider the merits of Rapid's critique of the trial court's "controlling person/control pre-mium" analysis *infra* at Part III.

Kirby harvested the timber on a "sustained yield" basis to maintain a steady and constant supply of natural resources for its wood production operations. *Id.*

The dissenting shareholders argued that the court should have evaluated Kirby on its acquisition value. *Id.* at 735–36. They claimed that Kirby's natural resources were much more valuable than its worth as an on-going concern. *Id.* The dissenters thus maintained that the court should have set Kirby's "fair value" at the price a third party would have paid for the company instead of relying on an evaluation of earnings or market price. *Id.*

The trial court rejected the dissenters' argument. *Id.* at 736. It reasoned that the liquidation value incorrectly assumed that Kirby would not have continued in its pre-merger form as an on-going concern. *Id.* This Court affirmed. *Bell,* 413 A.2d at 142. We agreed that the dissenters' liquidation approach violated the statute and improperly failed to consider Kirby's value apart from its acquisition value. *Id.*

### 2.

■ We find nothing in the record to convincingly support the claim that the court's "segmented" valuation technique was either identical or even similar to the liquidation approach rejected in *Bell.* The modified WMA valuation explicitly considered Rapid's subsidiaries as going concerns. *See Harris,* slip op. at 34–35. It placed special emphasis on financial data cumulated from operating results and not liquidation values. *Id.* at 19–22.

The "segmented" technique itself also did not manifest a liquidation analysis. Instead, the "segmented" approach best mirrored economic reality. Indeed, even Riklis admitted that "Rapid's value is best found in the sum of its parts." *Id.* at 10.

Riklis is right. The record fully supports our conclusion that the "segmented" valuation did not involve consideration of Rapid's break-up value. Instead, the court independently valued Rapid's three major subsidiaries according to their value as going concerns. There was no abuse of discretion.

### 3.

■ Rapid also challenges the trial court's decision not to consider its inherent value as a parent within WMA's "segmented" accounting technique. The record, however, indicates that WMA not only considered Rapid's parent-level financials, but that the trial court explicitly decided to exclude them. The court, after considering the record, held:

> I accept petitioner's determination that Rapid's parent-level revenues, assets and expenses amounted to a wash ... [p]etitioners' determination that these assets and expenses effectively cancel each other out is reasonable and has not been contradicted by respondents' evidence.

*Harris,* slip op. at 42.

Our review of the record also indicates that there was no need to add Rapid's parent-level considerations to its "fair value." The parent-level financial data is inconclusive and does not significantly affect the trial court's analysis. Again, there was no abuse of discretion.

### 4.

Rapid finally contests WMA's evaluation of its debt. Rapid faults the trial court for its decision to net out its debt to facilitate the "segmented" comparative analysis. Rapid also argues that the trial court artificially inflated Rapid's fair value when the court calculated equity value by subtracting the market value and not the higher book value of its debt. Rapid concludes that the court should not have considered its debt at market value because the discount between market and book value is only relevant upon an acquisition and liquidation. Rapid's argument is not persuasive.

■ Initially we note that Rapid did not explicitly object at trial to WMA's debt-free valuation. The court found that "[r]espondents have not objected to Willamette's debt-free valuation." *Harris,* slip op. at 13. Rapid's appeal of this valuation issue therefore is barred under Supreme Court Rule 8. In any event, the court did

not abuse its discretion when it adopted WMA's debt-free approach.

The face value of Rapid's debt at the time of the merger was $652,589,000, while the contemporaneous market value of the same debt was $356,154,000. The court was free to consider the realities of the market place in its evaluation of Rapid's intrinsic value. *See, e.g., Alabama By-Products*, 588 A.2d at 258; *Cavalier*, 564 A.2d at 1142–43; *Weinberger*, 457 A.2d at 713. In view of the well-established principle that a court can consider "all relevant factors" affecting value, there was no abuse of discretion in taking account of the market value of Rapid's debt.

### 5.

In sum, we find that the trial court did not abuse its discretion when it adopted a modified form of the WMA "segmented" valuation approach to determine the "fair value" of Rapid's shares before the merger. The "segmented" technique considered each subsidiary as a going concern. It did not attempt to ascertain Rapid's liquidation value.

The trial court also explicitly considered Rapid on its parent level. After considering the voluminous trial record, the court was convinced that the parent-level considerations were a "wash" and did not significantly impact Rapid's ultimate value. Finally, the court properly considered Rapid's debt at its market value. Far from constituting an abuse of discretion, the trial court's analysis of the debt issue reflected a proper consideration of market realities.

Accordingly, we affirm these three aspects of the trial court's decision.

### III.

■ We now consider the merits of Harris' cross-appeal. The trial court determined the publicly traded equity ("PTE") value of Rapid's shares after adopting WMA's "segmented" comparative valuation technique. *See Harris*, slip op. at 22–38. The court, however, refused to add a "control premium" to the PTE for each of Rapid's operating subsidiaries. The court, citing *Cavalier*, reasoned that adding a

"control premium" violated 8 *Del.C.* § 262 because it contravened the general proscription against weighing any additional factors affecting valuation "at the shareholder level." *Id.* at 29, 35, 38.

Harris claims that the trial court's decision to exclude a "control premium" constituted legal error. He argues that the court should have considered and valued Rapid's 100% interest in its subsidiaries. Harris maintains that WMA's valuation technique only compared its subsidiaries' PTE's with the individual shares of similar corporations trading in the market. He notes that the market price of these comparable corporations are discounted and do not reflect a control premium. Harris concludes that the trial court effectively treated Rapid as a minority shareholder in its wholly-owned subsidiaries. Harris contends that the trial court gave the new, privately-held Rapid, a windfall at his expense.

Rapid claims that the trial court did not commit error. Rapid, citing to *Cavalier* and *Bell*, argues that the addition of a control premium violates Delaware law because it takes into account Rapid's liquidation value. In sum, Rapid assumes that it could not realize a "control premium" unless it was sold to a third party. Rapid also argues that Harris only owned 1.2% of its outstanding shares and factually was not entitled to realize a "control premium."

### A.

■ In this respect the trial court's decision implicated a question of law. We review such matters *de novo* to determine whether the trial court "erred in formulating or applying legal precepts." *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990); *Cavalier*, 564 A.2d at 1141. After reviewing the entire record, we conclude that the trial court misinterpreted applicable legal precepts by erroneously omitting the "control premium."

### B.

A stock appraisal is a statutory remedy. *See Alabama By-Products*, 588 A.2d at 256; *Cede & Co. v. Technicolor, Inc.*, Del.

Supr., 542 A.2d 1182, 1186 (1988); *Weinberger*, 457 A.2d at 714. The statute contemplates that a reviewing court must exclude from its calculations "any element of value arising from the accomplishment or expectation of the merger or consolidation...." 8 *Del.C.* § 262(h).

 This Court, in accordance with the statutory mandate, has consistently held that a dissenting stockholder in an appraisal action is only entitled to "that which has been taken from him [or, in other words] his proportionate interest in a going concern." *Tri–Continental*, 74 A.2d at 72; *see also Cavalier*, 564 A.2d at 1144; *Cede*, 542 A.2d at 1186; *Weinberger*, 457 A.2d at 714. Two distinct but related concepts emerge from the statutory scheme. First, a court cannot assign value to any "speculative" events arising out of the merger or consolidation. *See Cavalier*, 564 A.2d at 1144; *Cede*, 542 A.2d at 1187; *Weinberger*, 457 A.2d at 714. Second, the court must value the dissenter's proportionate interest in the corporation as a "going concern" taking into account all other "relevant factors" affecting value. *Id. See Bell*, 413 A.2d at 142. In accordance with this principle, a court cannot adjust its valuation to reflect a shareholder's individual interest in the enterprise. As *Cavalier* succinctly states:

> The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the [trial court] is not required to apply further weighing factors at the shareholder level, *such as* discounts to minority shares for asserted lack of marketability.

564 A.2d at 1144 (emphasis added).

Rapid, in apparent agreement with the trial court, seizes upon *Cavalier*, and argues that the phrase "such as" similarly prohibits a court from adding "a control premium" at the shareholder level. Rapid indicates that adding a control premium at the shareholder level violates this Court's decision in *Bell*. It reasons that a control premium typically only "arises out" of the merger and is not part of Rapid's going-concern value.

We disagree with the trial court's characterization of the "control premium" in this case as an impermissible shareholder level adjustment. Its reliance on *Cavalier* and *Bell* is misplaced. The "control premium" Harris urged the trial court to adopt represented a valid adjustment to its valuation model which "applied a [bonus] at the company level against all assets...." *Cavalier*, 564 A.2d at 1144.

### C.

*Weinberger* recognized that there is no one exclusive means of assigning value to a Delaware corporation for purposes of an appraisal. 457 A.2d at 713–14. It interpreted the statutory language "all relevant factors" to include a multitude of non-speculative considerations. *Id.* 8 *Del.C.* § 262(h). Of course, one of the most important factors to consider is the very "nature of the enterprise" subject to the appraisal proceeding. *Id.; see Cavalier*, 564 A.2d at 1144–45; *Tri–Continental*, 74 A.2d at 72, 73.

*Tri–Continental* recognized that a court had the authority to discount the value of the enterprise at the corporate level. 74 A.2d at 76. The company appraised in *Tri–Continental* was a leveraged closed-end mutual fund. *Id.* at 73. The court understood that the shares of a leveraged closed-end mutual fund ordinarily trade at a discount of its underlying assets. *Id.* at 76. The court concluded:

> [T]he full value of the corporate assets to the corporation is not the same as the value of those assets to the common stockholder because of the factor of discount. To fail to recognize this conclusion ... is to fail to face the *economic facts* and to commit error.

*Id.* (Emphasis added).

 *Cavalier* also recognized the importance of assigning a realistic market value to the appraised corporation. 564 A.2d at 1144. Cavalier claimed that the *Tri–Continental* decision authorized shareholder level discounts to devalue the shares of the minority dissenters. The Court rejected that argument. It correctly inter-

preted *Tri–Continental* as standing for the proposition that an appraisal valuation must include consideration of the unique nature of the enterprise. *Id.* It drew the important distinction between assigning value at the corporate level and the shareholder level. *Id.* *Cavalier* authorized corporate level discounting as a means of establishing the intrinsic value of the enterprise. *Id.* at 1144. The court, however, rejected shareholder level discounting. It found that an appraisal explicitly considering the minority discount at the shareholder level both injects speculative elements into the calculation, and more importantly:

> [F]ail[s] to accord to a minority shareholder the full proportionate value of his shares [which] imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Id.* at 1145.

Rapid misses the fundamental point that Harris was not claiming a "control premium" at the shareholder level. Harris urged the trial court to add a premium at the parent level to compensate all of Rapid's shareholders for its 100% ownership position in the three subsidiaries. WMA's valuation technique arrived at comparable values using the market price of similar shares. These shares presumptively traded at a price that discounted the "control premium."

The trial court's decision to reject the addition of a control premium within the WMA valuation model placed too much emphasis on market value. Indeed, the Court of Chancery long ago rejected exclusive reliance upon market value in an appraisal action. *See Chicago Corp. v. Munds,* Del. Ch., 172 A. 452, 455 (1934); *see also Tri–Continental,* 74 A.2d at 72. *Munds,* referring to the 1929 market crash, found:

The experience of recent years is enough to convince the most causal observer that the market in its appraisal of values must have been woefully wrong in its estimates at one time or another within the interval of a space of time so brief that fundamental conditions could not possibly have become so altered as to affect true worth.

172 A. at 455. *Munds* continued:

> [I]f the market quotations are lower than what all the relevant facts that bear on value show it to have been worth, he should not be compensated according to the market's estimate.

*Id.* at 456.

*Munds'* succinct evaluation of the market has lost none of its lustre. Recent price changes in the stock market dramatically illustrate the defects of an *overstated* reliance on market price to determine a corporation's intrinsic value in an appraisal proceeding. *Cf. Application of Del. Racing Assoc.,* Del.Supr., 213 A.2d 203, 211 (1965) (emphasizing importance of considering market value in appraisal but nonetheless rejecting exclusive reliance on market price). While we do not fault the WMA valuation methodology, we do find that the trial court's decision to exclude the control premium may have inadvertently altered the reliability of its findings.

Rapid was a parent company with a 100% ownership interest in three valuable subsidiaries. The trial court's decision to exclude the control premium at the *corporate level* practically discounted Rapid's entire inherent value. The exclusion of a "control premium" artificially and unrealistically treated Rapid as a minority shareholder. Contrary to Rapid's arguments, Delaware law *compels* the inclusion of a control premium under the unique facts of this case.[2] Rapid's 100% ownership interest in its subsidiaries was clearly a "relevant" valuation factor and the trial court's rejection of the "control premium" implicitly placed a dis-

---

2. We are fully aware of the Court of Chancery's decision in *Cede & Co. v. Technicolor, Inc.,* Del. Ch., Civ.A. No. 7129, Allen, C. 1990 WL 161084 (Oct. 19, 1990), which explicitly rejected the inclusion of a "control premium" in a calculation of the intrinsic value of dissenting shares.

*Id.* at 50–52 & n. 41. We note that *Cede* is factually distinguishable and did not consider a corporate level "control premium." We now express no view on the particular merits of the trial court's holding in *Cede,* a case in which an appeal is now pending before this Court.

proportionate emphasis on pure market value. *See Weinberger*, 457 A.2d at 712–13; *Munds*, 172 A. at 456.

We also reject Rapid's implicit claim that the inclusion of a "control premium" violates our decision in *Bell*. Rapid seems to contend that a "control premium" is only payable when the corporation is liquidated. It concludes that the addition of a "control premium" incorrectly inflates Rapid's worth to an acquisition value instead of pricing its inherent value as a going concern.

We reject Rapid's arguments because *Bell* is easily distinguishable on its facts. Unlike *Bell*, the WMA valuation technique did not assume that an acquiror would liquidate Rapid. WMA's valuation technique added the "control premium" to reflect market realities. Rapid may have had a different value as a going concern if the court had considered that it enjoyed a 100% interest in its three major subsidiaries.

We recognize that the term "control premium" may be misleading here. The past decade has proven that an acquiror is often willing to pay a "control premium" in return for a majority interest in a corporation. Nonetheless, the WMA valuation technique utilized the control premium as a means of making its valuation more realistic. Under the circumstances presented here, the trial court was under a duty to assess the value of Rapid's full ownership in its subsidiaries.

Harris also argues that the control premium increases Rapid's fair value to $73.28 per diluted share, and urges us to adopt that sum on appeal. The trial court explicitly rejected the control premium without analysis. It now must reconsider that action. There is no basis for us to adopt Harris' claimed valuation.

Accordingly, we reverse the Court of Chancery and remand. The court must consider the "control premium," together with all other traditional valuation elements, and determine what, if any, additional value is to be ascribed to Harris' stock above the $51.00 per share initial finding.

IV.

We next turn to the second and final aspect of Harris' cross-appeal. Harris claims that the trial court abused its discretion by awarding him 12.75% simple interest. The trial court, after considering Harris' arguments, decided "not to depart from this Court's standard practice of allowing only simple interest." *Harris*, slip op. at 43. Harris now claims that the trial court abused its discretion in awarding only simple interest because it did not state a rationale for its ruling. Harris claims that the trial court ignored the recently amended language in 8 *Del.C.* § 262(i) which provides that "[i]nterest may be simple or compound, as the Court may direct." *Id.*

Harris, citing to two decisions from other jurisdictions, *In re Valuation of Common Stock of McLoon Oil Co.*, Me.Supr., 565 A.2d 997, 1007–08 (1989), and *Sarrouf v. New England Patriots Football Club, Inc.*, Supr., 397 Mass. 542, 492 N.E.2d 1122, 1128–29 (1986), urges this Court to adopt a "rule" presumptively awarding compound interest in every appraisal case. Harris claims that the Court should adopt this "rule" for three basic reasons. First, he argues that dissenting shareholders, unlike other investors, are deprived of their investment during the pendency of the appraisal proceeding. Harris concludes that no "prudent investor" would select a long-term investment paying only simple interest. Second, he maintains that the respondent corporation has the unfair use of the dissenter's resources during the appraisal proceeding and, unlike a commercial bank, should not be allowed to pay only simple interest. Finally, Harris argues that awarding simple interest only encourages investors to settle appraisal cases, and prevents them from legitimately vindicating their rights under the statute.

Rapid claims that the trial court did not abuse its discretion. Extrapolating from *Felder v. Anderson, Clayton & Co.*, Del. Ch., 159 A.2d 278, 286 (1960), Rapid suggests that Delaware law now provides that courts presumptively award simple interest in an appraisal case unless the dissenters

prove that the respondent corporation either prolonged the appraisal in bad faith, or somehow acted inequitably in relation to the valuation.

### A.

 We note that 8 *Del.C.* § 262(i) vests the trial court with the discretion to decide whether to award simple or compound interest. We review the trial court's decision to award Harris simple interest for an abuse of discretion. *See Kahn,* 591 A.2d at 175; *Alabama By–Products,* 588 A.2d at 258–59; *Cavalier,* 564 A.2d at 1146. After carefully viewing the record in this case, we do not find any abuse of discretion by the trial judge's award of simple interest.

### B.

We recognize that no Delaware case has ever explicitly considered the factors which determine whether a court should award either compound or simple interest.[3] The starting point of any analysis, however, must begin with the statutory corporation law. When the law is clear, our analysis usually ends with the statute itself. *See, e.g., Staar Surgical Co. v. Waggoner,* Del. Supr., 588 A.2d 1130, 1137 n. 2 (1991); *Alabama By–Products Corp.,* 588 A.2d at 258 n. 1.

 The recent amendment to the appraisal statute is clear and precise. It provides:

The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Interest may be simple or compound, as *the Court* may direct.

8 *Del.C.* § 262(i) (emphasis added). We reject both Harris' and Rapid's arguments because 8 *Del.C.* § 262(i) clearly gives the trial court absolute discretion to determine the form of interest it will award in a statutory appraisal action.

Harris' argument turns the permissive language of the statute into a mandatory requirement necessitating the award of compound interest in all cases. The arguments Harris raises in support of his "rule" could apply in every successful statutory appraisal action. The General Assembly certainly recognized this fact when it amended the statute in 1987. The legislature easily could have eliminated the provision mentioning simple interest and mandated an award of only compound interest. Harris' "rule" thus strips the statute of its clear and unambiguous meaning.

Rapid's "extrapolation" of the *dictum* in *Felder* is no more convincing. Indeed, Rapid's "bad faith" analysis intrudes on the purpose of an appraisal action. We have repeatedly emphasized that a statutory appraisal action is merely a method for dissenting shareholders to receive an independent judicial evaluation of the fair value of their shares. *Alabama By–Products,* 588 A.2d at 256; *Cede,* 542 A.2d at 1186; *Weinberger,* 457 A.2d at 714. We have recognized that allegations of fraud and bad faith have a limited place in a statutory appraisal action. *See Alabama By–Products,* 588 A.2d at 258 & n. 1 (court can consider claims of bad faith to assess credibility of trial witnesses).

 A derivative suit alleging bad faith and a statutory appraisal are two distinct causes of action. *Id.; see Cede,* 542 A.2d at 1187; *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1107–08 (1985). Rapid's argument upsets this dichotomy. It requires the court to explicitly consider allegations of bad faith to adjust the amount of the award. We have clearly ruled that the purpose of an appraisal action is not to punish the respondent corporation. *See Tri–Continental,* 74 A.2d at 72. The court must only award interest to fairly compensate dissenting shareholders for their losses incurred during the pendency of an appraisal. There is no punitive aspect of an appraisal proceeding.

---

3. *See, e.g., Cede,* slip op. at 70–82; *Pinson v. Campbell-Taggart, Inc.,* Del.Ch., C.A. No. 7499, Jacobs, V.C., 1989 WL 17438 (Feb. 28, 1989); *Charlip v. Lear Siegler, Inc.,* Del.Ch., C.A. No. 5178, Walsh, V.C., 1985 WL 11565 (July 2, 1985).

Under 8 *Del.C.* § 262(i) the trial court is vested with the clear discretion to award either simple or compound interest. It must take into account "all relevant factors" in reaching its decision. While not exhaustive, some of these factors can include the considerations enumerated in 8 *Del.C.* § 262(h). *See* 8 *Del.C.* § 262(h) ("[i]n determining the fair rate of interest, the Court may consider ... the rate of interest which the surviving or resulting corporation would have to pay to borrow money during the pendency of the proceeding.")

The trial court had the opportunity to fully consider the merits of Harris' claim in post-trial briefing. It also had the opportunity to hear expert testimony and evaluate the credibility and demeanor of witnesses throughout this lengthy trial. In view of the trial court's broad powers under 8 *Del.C.* § 262(i), there clearly was no error or abuse of discretion in awarding Harris simple interest.

Based on the foregoing, the judgment of the Court of Chancery is AFFIRMED IN PART AND REVERSED IN PART. The matter is REMANDED to the Court of Chancery for further proceedings consistent herewith.