PASKILL CORPORATION, a Florida corporation, Petitioner Below, Appellant,

v.

ALCOMA CORPORATION, a Delaware corporation, and Okeechobee LLC, a Delaware limited liability company, Respondents Below, Appellees.

No. 321, 1999.

Supreme Court of Delaware.

Submitted: Jan. 11, 2000.
Decided: March 7, 2000.

Matthew E. Fischer (argued), Michael D. Goldman, Stephen C. Norman, Potter, Anderson & Corroon, Wilmington, Delaware; James F. Downey, Stroock, Stroock & Lavan, LLP, New York City; and Seth E. Frank, LeBoeuf, Lamb, Greene & MacRae, LLP, New York City, for appellant.

Arthur G. Connolly, III, Samuel D. Brickley, II, Henry E. Gallagher, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; George J. Noumair (argued), John V. Thornton, Michael S. Press, Noumair & Riad, P.C., New York City, for appellees.

Before VEASEY, Chief Justice, HOLLAND and BERGER, Justices.

HOLLAND, Justice:

This appeal relates to a stock appraisal proceeding that was initiated in the Court of Chancery by the petitioner-appellant, Paskill Corporation ("Paskill"), a 14.6% minority shareholder of Okeechobee, Inc. ("Okeechobee"), a Delaware corporation.

The impetus for Paskill's petition for an appraisal was Okeechobee's merger with and into Okeechobee, LLC, a Delaware limited liability company wholly owned by Alcoma Corporation ("Alcoma"). Prior to the merger, Alcoma owned approximately 54% of Okeechobee's outstanding stock.

The Court of Chancery determined the fair value of the Okeechobee stock at the time of the merger was $10,049 per share. Paskill contended that the fair value was $13,206 per share. Alcoma argued the fair value was $9,420 per share.

Both sides have appealed from the final judgment that was entered in the appraisal proceeding. Paskill contends that the Court of Chancery's appraisal methodology erroneously included the "speculative" future tax liability that Alcoma attributed to the appreciation of Okeechobee's assets. Alcoma contends that the Court of Chancery's appraisal determination erroneously excluded its estimate of future expenses that would be incurred if and when Okeechobee's appreciated assets were ever sold. Alcoma has also cross-appealed from the award of interest on the amount payable to Paskill.

We have concluded that in making its appraisal, the Court of Chancery erroneously valued Okeechobee on a liquidation basis and exacerbated that problem when it calculated Okeechobee's net asset value by deducting speculative future tax liabilities. We have also decided that the Court of Chancery correctly excluded speculative expenses associated with uncontemplated sales when it attempted to compute Okeechobee's net asset value. Since the judgment of the Court of Chancery must be reversed, the issue relating to an award of compound interest is moot in this appeal.

### Facts

On November 12, 1997, Okeechobee, was merged into a wholly-owned subsidiary of Alcoma Corporation. Alcoma is wholly-owned by The Heckscher Foundation for Children, Inc., a not-for-profit corporation. Immediately prior to the merger, Alcoma

held 54%, and Paskill's ownership constituted 14%, of the outstanding stock of Okeechobee.

The Okeechobee stockholders were advised that, pursuant to the proposed Okeechobee/Alcoma merger, the minority stockholders of Okeechobee would receive in cash the "net asset value" of their stock and that Alcoma would receive "the equivalent per-share amount but in kind—the remaining assets after the cash paid to the minority shareholders." Alcoma described how it would calculate "net asset value":

> The net asset value would be determined by valuing the marketable stocks and bonds held by Okeechobee at their trading values on the New York Stock Exchange (or other public markets in which such securities are traded) shortly prior to the effective date of the merger. Any mortgages held by Okeechobee would be valued at full face value. The real estate of Okeechobee would be valued by an independent qualified real estate appraiser. The total of such assets at their fair market values would then be reduced by the liabilities of Okeechobee, *including capital gains tax that would be paid on the unrealized appreciation when such appreciation is realized.* Thus, the full fair market values of the net assets of Okeechobee as described above would be reflected by the net asset value of the shares. (emphasis added).

A special meeting of the stockholders of Okeechobee was held on November 6, 1997, to vote upon the proposed Okeechobee/Alcoma merger. Prior to the vote on the proposed merger, Paskill delivered a written demand for an appraisal of its shares pursuant to 8 *Del.C.* § 262(d)(1) of the Delaware General Corporation Law. Paskill voted its 140.625 shares against the proposed merger. Nevertheless, the merger was approved. Thereafter, Paskill perfected its right to appraisal under Section 262.

In a notice dated November 6, 1997, the Okeechobee's minority stockholder's shares were valued at $9,480.50 per share. The calculation of net asset value was set forth in a "Consolidated Statement of Net Assets" which was attached to the November 6 notice.

According to that Consolidated Statement, Okeechobee had "assets" [1] of $256,909 and "investments" of $7,402,114. The investments were: marketable securities consisting of stock and cash equivalents equal to $5,670,878; an operating parking garage in New York City valued at $6,270,000; unimproved land in Florida valued at $34,100; and a mortgage receivable relating to a Nashua, New Hampshire property valued at $1,098.014. The total value of the two properties and the mortgage receivable as of the valuation date was $7,402,114. The total value of Okeechobee's assets and investments equaled $13,329,901.

According to the same Consolidated Statement of Net Assets, Okeechobee had two liabilities as of the valuation date. Those liabilities consisted of "taxes payable-current" of $87,000 and "accrued expenses-operations" of $36,706. In addition to these two liabilities, Alcoma deducted "additional expenses" that totaled $3,725,700 and consisted of: $568,700 for the "estimated closing costs on sales-commissions, environmental issues, legal, etc." regarding the sale of the New York parking garage and unimproved land in Florida; $569,000 for the "deferred federal, state and other taxes" on the estimated unrealized capital gain on the securities held by Okeechobee; $2,338,000 for the "deferred taxes" on the estimated unrealized gain on the New York City parking garage; $240,000, for the "deferred taxes" on the mortgage receivable; and $10,000 for the "de-

---

1. $224,367 in cash, $13,601 in accrued income and $18,941 in prepaid expenses as of November 4, 1997 (the "valuation date").

ferred taxes" on the unimproved land in Florida.

## Court of Chancery

The Court of Chancery appraised Okeechobee exclusively on the basis of its net asset value. At the time of its merger with Alcoma, Okeechobee's investment assets were not for sale. Under those circumstances, the Court of Chancery determined .that Alcoma's deduction of the estimated expenses that Alcoma attributed to those uncontemplated sales of appreciated investment assets was improper. Nevertheless, the Court of Chancery held that it was appropriate to compute Okeechobee's net asset value by deducting the estimated future tax liabilities attributed to those uncontemplated asset sales on the basis of the investment assets' appreciated value. The Court of Chancery distinguished its *allowance* of deductions for possible future tax liabilities from its *disallowance* of deductions for possible future sales expenses as follows:

> First, sales expenses occur only when and if sale of an asset occurs. They are not an accrued, deferred liability such as capital gains tax. Sales expenses represent transaction costs associated with one possible use of an investment. It is a cost difficult to quantify because the seller may be able to reduce or eliminate the expenses. Okeechobee's investments were not sold, but retained by its acquirer at the time of the merger; therefore, sales expenses had not been

incurred and the minority shareholders should not front a portion of a cost that might (or might not) be incurred down the road. Instead, the minority are entitled to shareholders' *pro rata* share of the assets' value as a held investment.

The record reflects that a sale of its appreciated investment assets was not part of Okeechobee's operative reality on the date of the merger.[2] Therefore, the Court of Chancery should have excluded any deduction for the speculative future tax liabilities that were attributed by Alcoma to those uncontemplated sales. Conversely, the Court of Chancery properly denied any deduction from Okeechobee's net asset value for speculative expenses relating to future sales that were not contemplated on the date of the merger. The Court of Chancery erred by attempting to appraise Okeechobee exclusively on the basis of its net asset value, however, even if Okeechobee's net asset value had been calculated correctly. Our reasoning is set forth in the balance of this opinion.

## Appraisal in Delaware

■ An appraisal proceeding is a limited statutory remedy.[3] Its legislative purpose is to provide equitable relief for shareholders dissenting from a merger on grounds of inadequacy of the offering price.[4] Several eminent legal scholars have developed theories in an attempt to explain appraisal statutes.[5] The most recent is Professor Peter Letsou's "prefer-

**2.** *Paskill Corp. v. Alcoma Corp.*, Del.Ch., C.A. 16221, Steele, V.C. (June 16, 1999) Mem.Op. at 4–5, 1999 WL 438832 at *3. *Compare Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289, 298 (1996) (fixed view of selling certain assets was the operative reality on the date of the merger.)

**3.** *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289 (1996).

**4.** *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 542 A.2d 1182, 1186 (1988). *See* Randall S. Thomas, *Revising The Delaware Appraisal Statute*, 3 Del.L.Rev. 1 (2000). *See also* Rob-

ert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal Role in Corporate Law*, 84 Geo.L.J. 1 (1994) (discussing various proposals to reform Delaware's and other appraisal statutes.).

**5.** Daniel R. Fischel, *The Appraisal Remedy in Corporate Law*, 1983 Am.B.Found.Res.J. 875; Ronald J. Gilson & Bernard S. Black, *The Law and Finance of Corporate Acquisitions* 714–22 (2d ed.1995); Hideki Kanda & Saul Levmore, *The Appraisal Remedy and the Goals of Corporate Law*, 32 UCLA L.Rev. 429 (1985).

ence reconciliation" theory of appraisal,[6] which he explains as follows:

> ... when shareholders lack effective access to capital markets, risk-altering transactions (particularly those that alter the firm's market risk) can make some shareholders better off while leaving others worse off. Appraisal rights require the corporation to compensate shareholders who may be harmed by such transactions and place the net costs of providing that compensation on shareholders who otherwise gain. As a result, shareholders who otherwise gain from appraisal-triggering transactions will only vote in favor of those transactions if their gains more than offset the net costs of compensating objectors. Appraisal rights therefore decrease the probability of risk-altering transactions that result in net losses to shareholders, causing *all* shares to trade at higher prices *ex ante*.[7]

The Delaware appraisal statute affords dissenting minority stockholders the right to a judicial determination of the fair value of their shareholdings.[8] The statutory mandate directs the Court of Chancery to determine the value of the shares that qualify for appraisal by:

> ... determining their fair value, exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.[9]

In *Tri–Continental Corp. v. Battye*,[10] this Court explained the concept of value contemplated by the statutory mandate:

> ... that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger.

■ The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred.[11] Consequently, this Court has held that the corporation must be valued as an operating entity.[12] Accordingly, the Court of Chancery's task in an appraisal proceeding is to value what has been taken from the shareholder, *i.e.*, the proportionate interest in the going concern.[13]

### Alcoma's Liquidation Argument

In the briefs filed with this Court, Alcoma contends that its proposed net asset valuation constituted the fair value appraisal of Okeechobee's shares because the minority shareholders received "precisely the *same* value as [they] would" if "Okeechobee could have sold all of its assets, paid the applicable tax on the appreciation realized on the sale, and distributed the net cash proceeds after taxes to all shareholders." Alcoma's argument demonstrates a fundamental misunderstanding of Delaware's appraisal jurisprudence. It also conclusively establishes that the Court of Chancery did not properly determine

**6.** Peter V. Letsou, *The Role of Appraisal in Corporate Law,* 39 B.C.L.Rev. 1121 (1998).

**7.** *Id.* at 1123–24 (citations omitted).

**8.** *Id.* (citing *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 714 (1983)); *accord Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1142 (1989).

**9.** 8 *Del.C.* § 262(h).

**10.** *Tri–Continental Corp. v. Battye,* Del. Supr.,74 A.2d 71 (1950).

**11.** *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1145 (1989).

**12.** *Id.*

**13.** *Id.* at 1144 (citing *Tri–Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 72 (1950)).

the fair value of Paskill's shares in Okeechobee as a going concern.

### Liquidation Value Prohibited

■ In *Tri–Continental*, the phrase "net asset value" was defined as "simply a mathematical figure representing the total value of the assets of [the corporation] less the prior claims."[14] Accordingly, in *Tri–Continental*, this Court characterized "net asset value" as the "theoretical liquidating value to which the share would be entitled upon the company going out of business."[15] In footnote 2, we acknowledged that theoretical liquidating net asset value could never be obtained in an actual liquidation because of the attendant expenses, *e.g.,* sales costs and taxes.[16]

The seminal importance of *Tri–Continental* is readily apparent fifty years later when the principles it established are applied to the appraisal case *sub judice*. First, "the value of dissenting stock is to be fixed on a going concern basis."[17] Second, "the basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for what has been taken from him, *viz,* his proportionate interest in a going concern."[18] Third, "net asset value is a **theoretical** liquidating value to which the share would be entitled upon the company going out of business."[19] Fourth, because "the value of dissenting stock is to be fixed on a going concern basis, the taking of the net asset value as

the appraisal value of the stock is obviously precluded by the [going-concern] rule."[20] Fifth, since "net asset value is, in reality, a liquidating value, it cannot be made the *sole* criterion of the measure of the value of the dissenting stock."[21]

■ The Court of Chancery erred, as a matter of law, by relying upon the net asset value as the *sole* criterion for determining the fair value of Okeechobee's stock. It compounded that error when it deducted the speculative future tax liabilities from its net asset value calculation. That deduction was inconsistent with the theoretical nature of the liquidating value that this Court ascribed to the term "net asset value" in *Tri–Continental* and converted Okeechobee's theoretical net asset value into an actual liquidation value. Since it is impermissible to appraise a corporation on the sole basis of its theoretical liquidation net asset value, *a fortiori,* a statutory appraisal can never be made solely on the basis of an actual liquidation net asset value.[22]

### Nature of Enterprise

■ The dissenter in an appraisal action is entitled to receive a proportionate share of fair value in the *going concern* on the date of the merger, rather than value that is determined on a liquidated basis.[23] Therefore, the corporation must first be valued as an operating entity.[24] Consequently, one of the most important factors

**14.** *Tri–Continental Corp. v. Battye,* Del.Supr. 74 A.2d at 74.

**15.** *Id.*

**16.** *Id.*

**17.** *Id.*

**18.** *Id.* at 72.

**19.** *Id.* at 74 (emphasis added).

**20.** *Id.* at 74.

**21.** *Id.* at 75.

**22.** *See Bell v. Kirby Lumber Corp.,* Del.Supr., 413 A.2d 137 (1980); *Tri–Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71 (1950).

**23.** *Bell v. Kirby Lumber Corp.,* 413 A.2d at 142; *see also In re Shell Oil Co.,* Del.Supr., 607 A.2d 1213, 1219 (1992); *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1186 (1988); *Rosenblatt v. Getty Oil Co.,* Del. Supr., 493 A.2d 929, 942 (1985); *Rothschild Int'l. Corp. v. Liggett Group Inc.,* Del.Supr., 474 A.2d 133, 137 (1984). *Accord Rapid–American Corp. v. Harris,* Del.Supr. 603 A.2d 796, 802–03 (1992).

**24.** *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989). *See also Tri–Continental Corp. v. Battye,* 74 A.2d 71 (1950).

to consider is the "nature of the enterprise" that is the subject of the appraisal proceeding.[25]

According to Alcoma, Okeechobee was a closed-end investment company. We have assumed the *bona fides* of that contention for the purposes of this appeal. In *Tri–Continental*, one of Delaware's seminal appraisal cases, this Court considered the valuation of a regulated closed-end investment company with leverage that was engaged in the business of investing in a cross-section of the stock market.[26]

*Tri–Continental* was decided at a time when the Delaware Block Method was the exclusive basis for calculating the value of a corporation in an appraisal proceeding. "The Delaware Block Method actually is a combination of three generally accepted methods for valuation: the asset approach, the market approach, and the earnings approach."[27] Under the Delaware Block Method, the asset, market and earnings approach are each used separately to calculate a value for the entire corporation. A percentage weight is then assigned those three valuations on the basis of each approach's significance to the nature of the subject corporation's business.[28] The appraised value of the corporation is then determined by the weighted average of the *three* valuations.[29]

In *Tri–Continental*, this Court held that in determining what figure represents this true or intrinsic value of the corporation being appraised, the Court of Chancery:

must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise, and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.[30]

That holding has become one of the bedrock principles of Delaware's appraisal jurisprudence over the last fifty years.

In *Tri–Continental*, the factors and elements taken into consideration by the statutory appraiser[31] were: "the nature of the enterprise, i.e., a regulated closed-end investment company; leverage; discount; net asset value; market value; management; earnings and dividends; expenses of operation; particular holdings in the [corporation's] portfolio; and a favorable tax situation."[32] The appraiser found that under the circumstances presented, the factors of management, earnings and dividends, expenses of operation, and the portfolio of the corporation did not merit being debited or credited in arriving at a value for the common stock.[33] The appraiser also found there was no actual market for the corporation's stock at the time of the merger.[34]

Consequently, in *Tri–Continental*, the appraiser focused on the corporation's as-

---

25. *Rapid–American Corp. v. Harris*, 603 A.2d at 805; *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (1983).

26. *Tri–Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71 (1950).

27. *In re Radiology Assocs. Inc. Lit.*, Del.Ch., 611 A.2d 485, 496 (1991).

28. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 934 n. 6 (1985).

29. *Id.*

30. *Id.* at 72.

31. In 1976, the Delaware appraisal statute was amended to eliminate the mandatory appointment of an appraiser by the Court of Chancery. *Gonsalves v. Straight Arrow*, Del. Supr., 701 A.2d 357, 360–61 (1997).

32. *Tri–Continental Corp. v. Battye*, 74 A.2d at 73.

33. *Id.*

34. *Id.* at 74.

sets. This Court used three terms to describe that focus: net asset value, full asset value, and fair asset value.[35] We held that the *net* asset value could not be the sole measure of the corporation's common stocks value.[36] We also recognized that "the *full* value of the corporation's assets is not the same as the value of those assets to the common shareholder" because "discount is an element of value which must be given independent effect in the valuing of the common stock of regulated closed-end investment companies."[37] Therefore, given our recognition of the net asset value and the full asset value as polar extremes, this Court approved the appraiser's construction of a "fair asset value" at an intermediate level that included several elements of value over and above the net asset value. This Court then upheld the appraiser's use of Delaware Block Method to value the common stock by applying a discount to that fair asset value.

### Methodology Based Corporate Level Discount

The combined argot of law and economics requires periodic explication. *Tri–Continental* has been construed by this Court as standing for the proposition that an appraisal valuation must take into consideration the unique nature of the enterprise.[38] In *Tri–Continental,* this Court held that the Court of Chancery had the authority to discount asset values at the corporate level, in appropriate circumstances, as a means of establishing the fair value of the entire corporation as a going concern.[39] Read in the proper context, *Tri–Continental* was an acknowledgment that the Court of Chancery was vested with the authority to make a discount of the subject corporation's fair asset value at the corporate level because it constituted a proper application of an accepted methodology for arriving at the proper valuation of the unique corporate enterprise, *i.e.,* in *Tri–Continental,* the Delaware Block Method was applied to value a regulated closed-end investment company with leverage that was engaged in investing in a cross-section of the stock market. Similarly, this Court recently upheld the Court of Chancery's conclusion that a corporate level comparative acquisition approach to valuing a company, which included a control premium for a majority interest in a subsidiary, was a relevant and reliable methodology to use in an appraisal proceeding to determine the fair market value of shares in a holding company.[40]

■ Once the entire corporation has been fairly valued as an operating entity, however, the Delaware appraisal process requires the Court of Chancery to determine the fair value that has been taken from the dissenting shareholder who was forced out of the corporate enterprise, i.e., a proportionate interest in the entire going concern.[41] In *Weinberger,* this Court broadened the process for determining the "fair value" of the company's outstanding shares by including all generally accepted techniques of valuation used in the financial community.[42] As a result of that hold-

**35.** *Id.* at 73–76.

**36.** *Id.* at 75.

**37.** *Id.* at 76.

**38.** *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 806 (1992).

**39.** *Tri–Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 76 (1950).

**40.** *M.G. Bancorporation, Inc. v. LeBeau,* Del. Supr., 737 A.2d 513, 525 (1999). *Accord Rap-*

*id–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992).

**41.** *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989). *See* John C. Coates, IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions,* 147 U.Pa.L.Rev. 1251 (1999). *See also* Barry M. Wertheimer, *The Shareholder's Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613 (1998).

**42.** *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 712–13 (1983); *see Cede & Co. v.*

ing in *Weinberger,* the standard "Delaware block" or weighted average method of valuation, formerly employed in appraisal valuation cases, no longer exclusively controls such proceedings.[43]

■ The *ratio decidendi* in *Weinberger* was based upon the evaluation of the Delaware appraisal statute and this Court's prior holding in *Tri–Continental Corporation.*[44] Last year, this Court adopted the holdings of *Daubert*[45] and *Carmichael*[46] as the correct interpretation of Delaware Rule of Evidence 702 generally and for the admission of expert testimony in the specific context of determining the acceptability of a valuation theory or technique in an appraisal proceeding.[47] In *Bancorporation,* however, we once again held that, after the entire corporation has been valued as a going concern by applying an appraisal methodology that passes judicial muster, there can be no discounting at the shareholder level.[48]

■ We emphasize the last point because this matter will be remanded for another determination of fair value. In arguing that its liquidated valuation was fair, Alcoma noted that it did not seek a reduction for "the discount normally applied to unmarketable shares not registered with the Securities and Exchange Commission or traded on any public market."[49] Such a discount would have constituted an improper discount at the shareholder level.[50]

■ Upon remand, the Court of Chancery must ascertain the exact nature of Okeechobee as an enterprise.[51] It must then determine Okeechobee's fair value as a going concern on the date of the merger by any admissible valuation technique[52] that is based on reliable and relevant record evidence.[53] Paskill is then entitled to receive the fair value of its proportionate interest in that operating entity at the time of the merger without any discount at the shareholder level.

### Conclusion

The judgment of the Court of Chancery is reversed. This matter is remanded for further proceedings in accordance with this opinion.

*Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1186–87 (1988).

**43.** *Weinberger v. UOP, Inc.,* 457 A.2d at 712–13.

**44.** *See id.* at 713.

**45.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**46.** *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**47.** *M.G. Bancorporation, Inc. v. Le Beau,* Del. Supr., 737 A.2d 513 (1999).

**48.** *Id.* at 523–24. *Cavalier Oil Corp. v. Harnett,* 564 A.2d at 1145. *Accord Rapid–American Corp. v. Harris,* 603 A.2d at 806. *See* John C. Coates, IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions,* 147 U.Pa. L.Rev. 1251 (1999).

**49.** There was no discount at the shareholder level in *Tri–Continental* even though this Court acknowledged that there was no actual market for the common stock of the corporation that was being appraised. *Tri–Continental Corp. v. Battye,* Del.Supr., 74 A.2d 71, 74 (1950).

**50.** *Id.*

**51.** *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989).

**52.** *Weinberger v. UOP, Inc.,* 457 A.2d at 713–14.

**53.** *M.G. Bancorporation, Inc. v. Le Beau,* Del. Supr., 737 A.2d 513 (1999).