# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HYDE PARK VENTURE PARTNERS FUND III, L.P. and HYDE PARK VENTURE PARTNERS FUND III AFFILIATES, L.P., | ) ) ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 2022-0344-JTL |
| FAIRXCHANGE, LLC, a Delaware limited liability company, as successor in liability to FAIRXCHANGE, INC., a Delaware corporation, | ) ) ) ) ) | |
| Respondent. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: March 22, 2024
Date Decided: July 30, 2024

A. Thompson Bayliss, Samuel D. Cordle, Anthony R. Sarna, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Petitioners*.

David E. Ross, Garrett B. Moritz, Adam D. Gold, Elizabeth M. Taylor, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Respondent*.

**LASTER, V.C.**

This is an appraisal proceeding. The court's task is to determine the fair value of FairXchange, Inc. ("FairX" or the "Company"). Valuing a corporation is difficult. For FairX, that is especially true.

FairX was a Delaware corporation that operated a nascent securities exchange catering to retail investors who wanted to trade commodity futures. FairX built fast, reliable, and adaptable technology to run its exchange, and the same technology could be used for retail trading in cryptocurrency futures.

FairX was privately held, so there was no trading price. FairX was early in its development, so its operations lacked any track record. And FairX sought to achieve great things: Just as the Robinhood trading platform used a disruptive market-maker-pays business model to bring zero-to-low cost trading in equities and equity-derivatives to retail users, FairX sought to do the same thing for futures. FairX's was a version of Schrödinger's cat. If an investor opened the valuation box in five years, then FairX could be a unicorn worth billions. Or FairX could be dead.

This appraisal proceeding exists because a near-term merger preempted the unboxing. For roughly a six-month period from September 2021 to February 2022, large cryptocurrency players sought to become vertically integrated by acquiring companies that ran exchanges. All of the targets were in the early stages of their development, yet the amounts that acquirers were willing to pay for those companies soared. A bidding contest for one of FairX's peers—ErisX—topped out at over $550 million.

After the ErisX deal, FairX's CEO desperately wanted a near-term exit of his own. Despite never having been involved in a sale process before, FairX's CEO attempted to conduct one himself. Without securing prior approval from the board of directors (the "Board"), he solicited an acquisition proposal from Coinbase Global, Inc., the cryptocurrency juggernaut. Both before and after Coinbase provided a letter of intent, FairX's CEO made rookie mistakes. Rather than seeking to create a competitive dynamic, he reassured Coinbase that he would get the deal done. He also negotiated improved consideration for himself and two senior managers at the same time he softly asked Coinbase to increase its price. He plainly left value on the table.

On January 11, 2022, Coinbase agreed to acquire FairX for $330 million (the "Merger Agreement"). The consideration took the form of $265 million in Coinbase stock and $65 million in cash. The transaction closed on February 1, 2022 (the "Merger"). Between signing and closing, Coinbase's stock price declined, and the value of the consideration dropped to $310.4 million.

Hyde Park Venture Partners ("Hyde Park") managed two venture capital funds that owned approximately 15% of FairX's equity. Ira Weiss, the Hyde Park partner who sponsored the investment, served on the Board. Appalled by the CEO's actions and convinced of FairX's great potential, Weiss argued for a banker-led sale process. For that he was attacked and removed from the Board. After his removal, Weiss advocated publicly that FairX's stockholders reject the Merger. They approved it instead. After the Merger closed, the two Hyde Park funds sought appraisal.

The Delaware Supreme Court has cautioned that "[t]here may be no perfect methodology for arriving at fair value for a given set of facts."[1] This is one of those cases. Even though neither party has asked the court to look to the deal price, it is the least bad method for determining fair value. The record does not support a synergy deduction, nor any adjustment to reflect a change in value between signing and closing. The fair value of FairX for purposes of this appraisal proceeding is $330 million. That equates to $10.42 per share.

## I. FACTUAL BACKGROUND

Trial took place over three days. Six fact witnesses and two experts testified live. The parties introduced 2,525 exhibits, as well as deposition transcripts from twenty-eight witnesses. In the pre-trial order, the parties agreed to 144 stipulations of fact.

Although FairX is named as the respondent in this appraisal proceeding, the real parties in interest are the selling stockholders, led by FairX's CEO (collectively, the "Selling Stockholders"). In the Merger Agreement, the Selling Stockholders agreed to indemnify Coinbase for any appraisal award that exceeded the Merger consideration. This decision therefore refers to the Selling Stockholders as taking the positions that FairX nominally espoused.

---

[1] *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 22–23 (Del. 2017).

3

As often happens in an appraisal proceeding, the parties offered starkly different depictions of the company to be valued. Hyde Park mustered the bulk of the contemporaneous documents to show that FairX management and its backers were optimistic about its prospects. Hyde Park also sought to prove that management prepared projections in the ordinary course of business that are sufficiently reliable to use for valuation purposes. The Selling Stockholders collected negative statements from fewer documents and used those statement and their testimony to denigrate FairX. They also sought to discredit the projections they prepared.

In this case, the record reveals precisely when the Selling Stockholders created their litigation narrative. On January 5, 2022, after speaking with a Delaware lawyer from their outside law firm and learning about appraisal proceedings, the Chairman of the Board prepared and circulated to other insiders an "Outline of [FairX's] Operative Reality Today."[2] In it, the Chairman laid out a "narrative . . . . to show . . . that we really did have a deliberative process" and to portray the sale to Coinbase as the only option for a company with "[z]ero prospect[s]" and "virtually no chance of success."[3]

On the whole, Hyde Park's account was more credible. Unfortunately, that account does not solve the court's valuation problem.

---

[2] JX 1622.

[3] *Id.*

4

In an appraisal proceeding, each side bears the burden of proving its own factual contentions and valuation positions.[4] The record supports the following factual findings.[5]

## A.    The Company

In 2019, Neal Brady, Cliff Lewis, and Harsha Bhat founded LMX Labs, LLC—later known as FairX—with the goal of revolutionizing how retail investors trade futures. Just as Robinhood had done for the equities market, FairX sought to flip the prevailing futures-market business model by charging market makers for order flow and rebating a portion of that revenue to brokers. That payment stream in return would incentivize brokers to route their trades to FairX and enable the brokers to lower or eliminate the commissions they charged. FairX also planned to offer innovative nano-sized futures contracts that would be more attractive to retail investors, just as Robinhood offered lower-cost investments in fractional shares. And FairX planned to provide retail investors with free market data.

---

[4] *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. 2020) (cleaned up).

[5] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 166. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from deposition transcripts. Citations in the form "JX —— at —" refer to trial exhibits and their internal page numbers. If a trial exhibit lacks internal page numbers, then the citations use the last three digits of the control number. If trial exhibits use paragraph numbers, then the citations use those.

Brady, Lewis, and Bhat were industry veterans, and FairX was not their first rodeo. Brady became FairX's CEO. He had worked for twenty-five years in the commodities space. Earlier, Brady co-founded ErisX, a FairX competitor, where he served as CEO. After quarreling with the firm's lead investor, Brady sold his stake and left. That decision haunted him, and in October 2021, when the Chicago Board Options Exchange ("CBOE") agreed to buy ErisX for over $550 million, Brady was apoplectic. He craved a similar exit, and days later, he unilaterally launched a sale process by soliciting an offer from Coinbase. Sadly, Brady had no experience selling a company. He repeatedly blundered and left value on the table.

Lewis became Chairman of the Board. Before co-founding FairX, he had worked for over thirty years in the commodities world. He was a longtime Brady ally who thought ErisX had treated Brady unfairly and that Brady deserved an exit. He overcame his initial misgivings about the sale process to help Brady complete the Merger. He created the Selling Stockholders' made-for-litigation account.

Bhat became the Chief Technology Officer and oversaw the build-out of FairX's trading platform. Before co-founding FairX, Bhat had developed some of the world's fastest and most feature-rich trading platforms. Bhat built ErisX's cash crypto and crypto futures platforms, plus low latency cash trading platforms for other companies.

Boris Ilyevsky joined FairX in October 2020 as its Chief Product and Strategy Officer. During his career, Ilyevsky built three equity options markets. He spent seventeen years building the International Securities Exchange ("ISE"), which brought electronic options to retail trading. Ilyevsky was Brady's right-hand man.

6

**B.      Perfect Timing**

FairX's founders sought to take advantage of explosive growth in retail trading, and they could not have chosen a better time. From 2014 to 2019, retail futures trading grew by an astounding 30% year over year. Although they could not see the future when they started FairX, retail futures trading during the COVID pandemic would increase by another 80%. Even as the pandemic waned, the levels of retail trading continued. Consumer interest in crypto was also building, and by December 2020, Brady saw crypto futures as a billion-dollar opportunity.

To implement their retail-focused futures strategy, Bhat and his engineering team built a world-class trading platform from scratch. The technology was fast, reliable, and adaptable.

The biggest threat to FairX's business plan was the Chicago Mercantile Exchange ("CME"), which held a near monopoly in futures trading. CME, however, was not focused on retail investors. As the dominant incumbent, CME was also unlikely to change its strategy.

Instead, what CME offered was highly liquid trading markets, because virtually all of the average daily volume ("ADV") of trading in futures took place on its exchange. To obtain the most accurate prices, brokers and market makers will flock to the exchange that offers the greatest ADV and associated liquidity, resulting in winner-take-all network effects for the most popular market. FairX's business model depended on convincing brokers and market makers to support a second, retail-oriented exchange by routing retail clients to FairX in sufficient volume to

7

create a highly liquid market. Either FairX would achieve the goal and succeed, or it would fail.

There were also regulatory hurdles. To act as an exchange, FairX needed to secure a license to act as a designated contract maker (the "Exchange License"). FairX also either needed to obtain a license to act as a derivatives clearing organization (the "Clearing License") or find a business partner who would clear the trades taking place on FairX's exchange.

## C.    The Series A Round

In November 2019, FairX completed a Series A financing round, raising $5.6 million at a pre-money valuation of $15.6 million. Hyde Park led the round and invested $1.5 million. Paul Finnegan, a legendary investor and the former chair of Madison Dearborn Partners, invested as well. So did John Rompon of Marjo Investments. So did JR Brown Associates. And so did TD Ameritrade, a leading retail broker and one of the strongest firms for futures trading.

The Series A stockholders had the right to designate one director. They selected Weiss, the Hyde Park partner who sponsored its investment. Weiss is a Clinical Professor of Accounting and Entrepreneurship at The University of Chicago Booth School of Business. TD Ameritrade secured a Board observer seat and appointed J.B. Mackenzie, one of Brady's good friends.

## D.    Assembling The Key Pieces

After the Series A round, FairX began accumulating the pieces that success would require. In April 2020, FairX applied to the Commodity Futures Trading Commission (the "CFTC") for its Exchange License. Rather than also seeking a

Clearing License, FairX contracted with Nodal Clear ("Nodal") to clear its trades. Nodal had a Clearing License, but not for third-party trades. Nodal applied to the CFTC for approval to clear third-party trades.

In August 2020, FairX secured a license from Bloomberg to use its S&P BSE 500 Index for testing and demonstrations. In return, FairX gave Bloomberg a right of first offer ("ROFO") if anyone sought to acquire FairX. DLA Piper, which acted as FairX's outside counsel, drafted the ROFO so it could be used to create a sense of competition and lead to a higher price.

## E. The Series B Round

In September 2020, FairX completed a Series B round, raising $13.8 million at a pre-money valuation of $42 million. Hyde Park again led the round, investing $5 million in exchange for 2,667,521 shares of Series B preferred stock. Other investors included Finnegan (2,667,050 shares) and Battery Ventures (533,504 shares). Datek, another leading online broker, purchased 224,879 shares. FairX granted Finnegan a Board observer seat.

In November 2020, the CFTC approved FairX's Exchange License, enabling FairX to act as an exchange. The CFTC also granted Nodal's request to clear third party trades. FairX had overcome the two regulatory hurdles it faced.

## F. Initial Contact With Coinbase

Meanwhile, Coinbase was exploring offerings in cryptocurrency futures. Coinbase hoped to accelerate its entry into the futures market by acquiring an entity with an Exchange License. To capture as much of the economics as possible, Coinbase

wanted to clear its own trades, which meant acquiring an entity with a Clearing License. Ideally, the same target would have both.

FairX was already toying with the idea of using its platform for retail trading in crypto futures. In March 2021, Brady spoke with Coinbase about crypto products that could trade on FairX's exchange. Those discussions continued sporadically over the following months.

## G.     The Series B1/B2 Round

In April 2021, FairX completed a Series B1/B2 round, raising $7.5 million at a pre-money valuation of $105 million. The principal purpose of the round was to secure investments from brokers and market makers. FairX believed that if brokers and market makers invested in FairX, then they would be more likely to use its exchange.

FairX's management team created a set of projections to market the round. The management team sent the projections to investors and later to venture debt lenders, including Silicon Valley Bank.

The projections represented management's best estimate of FairX's future cash flows. That said, FairX was a new and potentially revolutionary business, so management had no track record to build on. The projections were optimistic and assumed FairX would hit its milestones.

Three strategic partners invested in the Series B1/B2 round: Tradovate, a broker, and XTX and Virtu, two market makers. FairX's existing investors also purchased shares.

10

## H. The June 2021 Soft Launch

Since its inception, FairX had operated in stealth mode to avoid attention from CME and other potential competitors. As FairX consistently hit its milestones, management began planning a demonstration to show how well FairX's technology worked. A heavily marketed launch risked alarming competitors if it went well and disappointing potential customers if it went poorly. A quiet launch might fail to attract customers.

Brady and his team decided on a quiet launch. If it went well, they expected to use the results to build momentum with brokers and market makers over the following months.

FairX initially expected TD Ameritrade, E*TRADE, and Tradovate to participate in the soft launch, but TD Ameritrade and E*TRADE insisted on FairX hitting minimum volume and liquidity targets before they would route trades to the exchange. For a new launch, FairX could not guarantee that. After initially delaying the launch in hopes that TD Ameritrade and E*TRADE would come around, FairX decided to launch with Tradovate as its only broker.

The soft launch took place on June 28, 2021. The technology worked flawlessly. The Company's investors thought the event confirmed the investment thesis.

The next challenge for FairX was to increase the trading volume and associated liquidity. The low volume associated with the soft launch would not cut it. To increase volume, FairX began offering additional incentives for brokers to route trades to its

11

exchange. That was a good way to create near-term liquidity, but paying for trades was not a viable long-term strategy.

## I.     The Series C Round

In August 2021, Brady decided that FairX would not be able to attain sufficient trading volume without offering crypto futures.[6] He envisioned re-positioning FairX as a crypto futures exchange with a major player like Coinbase supplying the trades and five to eight market makers providing liquidity.

To pursue the crypto-futures plan, Brady wanted a deeper commercial relationship with Coinbase. He and Coinbase had been speaking intermittently about crypto products. To reset the discussion, Brady sent Coinbase a plan under which FairX would launch retail trading in crypto futures by the fourth quarter of 2021.

To fund the move into crypto, FairX sought to raise a Series C round. Brady and his team thought an investment from Coinbase would supercharge investor interest, so they approached Coinbase about that as well.

In August 2021, Coinbase conducted due diligence on FairX. In early September 2021, Coinbase offered to invest at least $5 million in a Series C round

---

[6] JX 470 at 1. In this email, Brady referred to the soft-launch as a "failure." In this proceeding, FairX has tried to depict Brady's comment as applying to the soft launch as a whole. In reality, Brady was referring only to the levels of trading volume and liquidity, which were insufficient to attract large brokers and market makers to its exchange. The technology was not a failure. It worked flawlessly. And the low volume and liquidity were not unexpected. FairX had planned to use the success of a quiet launch to establish relationships with additional brokers and market makers.

12

through its venture capital arm. Coinbase also indicated it was open to co-leading the round.

Coinbase wanted to make its investment in conjunction with a commercial deal with FairX. That was music to Brady's ears. Later that month, Coinbase applied with the CFTC to be a licensed crypto broker that could offer cryptocurrency futures.

On September 12, 2021, Weiss asked Brady what valuation he was targeting for the Series C round. Brady said that before Coinbase expressed interest, he had been targeting a pre-money valuation of $150 million. With Coinbase investing, Brady thought the pre-money valuation could range from $200 million to up to $400 million, depending on how specific the commercial agreement was.

**J.    The Crypto Tsunami**

FairX's plain to reorient towards cryptocurrency futures took place against a backdrop of increasing interest in crypto and a spate of acquisitions as large crypto players sought to become vertically integrated. On August 31, 2021, FTX announced that it was buying LedgerX. At the time, FTX was the leading US-regulated cryptocurrency exchange.

The FTX acquisition sparked market interest in firms that could trade crypto futures. Brady called the deluge of market interest a "crypto tsunami."

Four crypto companies approached FairX during September 2021. The U.S. head of Crypto.com said that his company wanted to buy a futures exchange and expressed interest in FairX. Bitstamp asked whether FairX was open to an

13

acquisition and wanted to continue the discussions. Polymarket and Kraken asked if FairX was for sale.

For its part, Coinbase had already decided to acquire a company with an Exchange License and ideally a Clearing License. By September 2021, Coinbase had narrowed its list of targets to ErisX, FairX, and Bitnomial. Coinbase decided to pursue ErisX first because it had both licenses. FairX was the second choice.

ErisX had already started a banker-led sale process. Coinbase submitted a bid of $300 million, but ErisX entered into exclusivity with CBOE. Coinbase upped its bid to $400 million, and CBOE countered at $564 million. Coinbase raised its offer to $450 million, but ErisX took the higher bid.

As soon as Coinbase learned it had lost, the deal team turned to FairX. Coinbase felt burned by its experience with ErisX and wanted to secure its target without another bidding war. To that end, Coinbase realized that one of FairX's alternatives to a sale would be to complete its Series C round and remain independent. To stop that from happening, Coinbase interfered with the round.

FairX had approached Andreesen Horowitz, a premier venture capital firm, about investing in its Series C round. Andreesen Horowitz was a major investor in Coinbase, so FairX asked Coinbase if they could tell Andreesen Horowitz that Coinbase was interested in co-leading the round. Coinbase gave its approval. After

approaching Andreesen Horowitz, FairX thought a round co-led by Coinbase and Andreesen Horowitz was a realistic possibility.[7]

Then, in direct violation of its non-disclosure agreement with FairX, Coinbase contacted Andreesen Horowitz. To reduce the attractiveness of the Series C round as an option, Coinbase asked Andreesen Horowitz to string out its response to FairX. Andreesen Horowitz obliged.[8] Those machinations reduced the attractiveness of the Series C round as an alternative for FairX. By contrast, if Coinbase and Andreesen Horowitz had led the Series C round, then it would have been a done deal.

As it was, FairX's principal investors were ready to invest in a Series C Round. Hyde Park, Finnegan, and Battery Ventures all expressed interest. Securing new investors was more difficult, at least without being able to point to Coinbase leading the round or co-leading it with Andreesen Horowitz.

## K.  Brady Solicits A Bid From Coinbase.

The news that CBOE was buying ErisX for over $550 million sent Brady into a tailspin. Brady had been one of the co-founders of ErisX, and he felt cheated out of his $25 million share of the proceeds. He wanted an exit of his own, and he turned to Coinbase in hopes of achieving one.

On October 21, 2021, Brady emailed Greg Tusar of Coinbase, writing:

With the ErisX acquisition, I wanted to sync up on [Coinbase's] strategy in the CFTC space, and *see if we could partner in a more*

---

[7] *See* JX 826.

[8] *See* JX 990.

*transformational way*. Having founded ErisX, I have a very good idea of how we could do what CBOE is setting out to achieve . . . or what Coinbase might have been able to do with an ErisX.[9]

The Coinbase deal team recognized the email for what it was: an invitation to make a bid. Brady did not secure Board authorization before that outreach.

That night, Brady worked until 3:00 in the morning on what he called his "'buy me' plan."[10] On October 22, Brady met with the Coinbase team and told them that FairX was "open to a full acquisition." The Coinbase meeting attendees thought Brady "was practically jumping out of his chair saying we needed to do something."[11]

After the meeting, Tusar asked about a specific figure. Brady emailed back, "'less than 550' 😉."[12] That had been the price for ErisX. Through his message, Brady capped the value of any deal for FairX.

Brady never informed the Board about those discussions.

## L.    Brady Contacts Other Players.

On October 23, 2021, Brady reached out to Crypto.com, Bitstamp, and Kraken. He wanted an exit, and he was not yet sure if Coinbase would take the bait.

---

[9] JX 852 (emphasis added).

[10] JX 854 (emphasis added).

[11] JX 864 at 2–3.

[12] *Id.* at 2.

16

To ensure that Coinbase focused on an acquisition, Brady sent an email on October 24, 2021, in which he rejected Coinbase's offer to invest $5 million or more in the Series C round. He wrote:

> While we appreciate Coinbase's interest in participating in our Series C round for a small amount, *we don't think the framework we've been operating under . . . fits the moment:* this market opportunity is too big . . . .
>
> In terms of structure . . . . *[i]f this were an outright acquisition of FairX,* they key questions are 1) do we both agree this is best done as part of a consortium? and 2) if so, what is the optimal sequence – to have Coinbase buy first and then invite additional participants, or does the consortium get assembled at the start?[13]

Brady again addressed price: "[A]s I said on Friday, . . . [o]ur sense of the proper value is somewhere between that pre-launch post-money valuation [$115 million] and the ~$550M or so that we understand has been recently paid for ErisX."[14]

Brady sent drafts and the final version of his email to Bhat and Ilyevsky. He even sent the final email to his spouse. He did not inform the Board. Instead, he told Bhat and Ilyevsky to "[k]eep [Brady's October 24 email] on the private email and don't respond."[15] They complied.

---

[13] JX 892 (formatting added) (emphasis added).

[14] *Id.*

[15] JX 1317.

**M.    Two Event-Filled Days**

Over October 28 and 29, 2021, Brady reached a deal with Coinbase. He did not involve the full Board, and he spent more effort optimizing his personal payout than negotiating the deal consideration.

**1.    October 28**

On October 28, 2021, at 2:23 PM, Coinbase sent Brady a letter of intent (the "Initial LOI"). It contemplated acquiring FairX for $285 million, comprising $235 million in Coinbase stock and $50 million in cash.[16] The Initial LOI proposed equity awards for Brady, Ilyevsky, and Bhat (the "Key Employees") with the awards vesting in equal amounts over a three-year period.

At 10:43 PM, Brady forwarded the Initial LOI to his spouse. She did not work for the Company or in the industry. Brady never forwarded the Initial LOI to the Board. Brady deliberately kept Weiss in the dark because he expected Weiss to disagree over both the valuation and how Brady had solicited the transaction.[17] In his response to the Initial LOI, Brady assured Coinbase that "there is an amazing opportunity ahead of us as one team."[18]

Brady then focused on his own payout. At 11:26 PM that night, he asked his counsel at DLA Piper, "if we ask for more up front, say 50% in consideration at Close,

---

[16] JX 959.

[17] *See* Brady Tr. 302–03; Ilyevsky Tr. 586.

[18] JX 963 at 2.

18

does that 'cost' [CoinBase] anything . . . ?"[19] Brady also asked counsel to confirm that he and Lewis could prevail over Weiss in any Board vote.[20]

### 2. October 29

Brady had shared the Initial LOI with Lewis. At 8:44 AM on October 29, 2021, Lewis emailed Brady about getting a higher price for the Company. He told Brady that he "saw . . . a potential opportunity to extract value if . . . [Coinbase] didn't value the noncrypto trading" and that they should not "miss[] a chance to start a bidding war."[21] Brady did not respond in writing, telling Lewis, "call you in ~30."[22]

Brady turned to Rompon for advice on negotiating a better package for the Key Employees. Rompon was a former attorney who led a venture capital fund that invested in the Company. Rompon sent back a blank email with the subject line "Call Me When Received" and attached a file named "NB Net.xlsx," presumably a reference to "Neal Brady Net."[23] The analysis addressed different vesting schedules that Brady could ask for and showed that a 40/20/20/20 vesting schedule would give Brady the most consideration at closing.

---

[19] JX 1006 at 3.

[20] *Id.* at 2 ("I have 2 of the 3 seats.").

[21] Lewis Dep. 377, 382.

[22] JX 973.

[23] JX 975; Brady Tr. 381–82.

Later that day, Brady asked Coinbase for a 40/20/20/20 vesting schedule.[24] On price, he softly asked that Coinbase get "closer to a 3x on [FairX's] last round [of] $112M," or $336 million.[25] He told Coinbase that those changes would make the deal a "slam dunk" that "we can get signed . . . quickly."[26]

Shan Aggarwal, who led the Coinbase deal team, was coyly non-committal. Brady responded that he was on board either way: "Appreciate anything you can do and will do everything I can on my end to get this done."[27] Brady forwarded the email exchange to his spouse but not the Board.[28]

### 3. The Revised LOI

At 8:35 PM that same day, Coinbase sent Brady a new LOI (the "Revised LOI").[29] It provided for an improved vesting schedule just short of Brady's ask (35/15/25/25) and a higher headline price of $330 million, just short of Brady's suggestion of $336 million.[30] The new split would be $265 million in stock and $65 million cash.

---

[24] JX 978; Brady Tr. 383.

[25] JX 966.

[26] *Id.*

[27] JX 978.

[28] JX 977.

[29] JX 979.

[30] *Id.*

Still in the dark, Weiss asked Brady that afternoon if Coinbase was "leaning in on a larger [Series C] round size[.]"[31] Based on Coinbase's involvement and the addition of crypto futures, Weiss proposed an $80 million round with a pre-money valuation of $520 million.[32] Instead of mentioning either the Initial LOI or the Revised LOI, Brady obfuscated: "I think they are definitely leaning in. We broke through the past week and the business guys are really committed."[33] Weiss continued to believe (wrongly) that the ongoing FairX-Coinbase discussions contemplated a larger round and a commercial agreement, not an acquisition.

After a 6:00 PM follow-up call with Aggarwal, Brady and Lewis crowed about how they would make more money on the FairX deal than they would have on ErisX.[34] Having secured the payout he wanted, Brady focused on doing everything he could to ensure the deal closed.

### 4. Brady Resists Advice From His Directors, Observers, and Advisors.

On the evening of October 29, 2021, Brady forwarded the Revised LOI to Weiss.[35] Brady stripped his email of Coinbase's cover message, which referenced the

---

[31] JX 981.

[32] *Id.*; *see* Weiss Tr. 50–52.

[33] JX 981.

[34] *See* JX 983.

[35] JX 1017.

21

Initial LOI. Weiss did not learn of the Initial LOI until days later, when DLA Piper mentioned it in passing.[36]

After seeing the Revised LOI, Weiss, Finnegan, Rompon and Scott Kapp of DLA Piper raised process concerns. Finnegan wanted to shop the deal because "FairX had [a] shot at being [a] unicorn."[37] Rompon wanted FairX to hire a banker to make something happen "with another zero or two" and account for "the non-Crypto stuff" "which [Coinbase] . . . is not really paying for[.]"[38] Finnegan and Rompon brainstormed about potential bidders to convince Brady to shop the deal.[39] Kapp and Rompon agreed FairX would benefit by slowing down, fleshing out the LOI, and soliciting other bidders.[40]

Brady resisted. He "want[ed] to move full steam ahead with the current Coinbase offer."[41] On October 30, 2021, Brady told Ilyevsky and Bhat that he had been "talking to [Weiss], Finnegan, and [] Kapp all day, arguing them away from fantasies about shopping this deal, improving the terms, or . . . VC funding and

---

[36] Weiss Tr. 55.

[37] JX 1004; Finnegan Tr. 683–84.

[38] JX 1046; JX 1055.

[39] JX 1057.

[40] JX 1011.

[41] JX 1029.

22

secondary liquidity for management."[42] Bhat praised Brady for "doing the messy work

. . . !!"[43] When Weiss raised his concerns on a group call, Lewis vented: "Unbelievable

jerk[.]"[44] Brady replied: "I'm closing this [Coinbase] deal for sure now. The alternative

of sticking around got even worse."[45]

## N. A "Quick Pass" On The ROFO

Kapp advised Brady that he could use Bloomberg's ROFO to slow down the

process, secure a competing bid, and put competitive pressure on Coinbase.[46] Brady

decided to go in the opposite direction by getting Bloomberg "to return a quick 'we

pass[.]'"[47] Kapp agreed with Finnegan and Weiss about the importance of seeking a

better deal and creating competitive pressure, but he recognized that Brady and

Lewis wanted to take the Coinbase deal.[48]

Brady sent Bloomberg the ROFO notice on November 1—three days after

receiving the Revised LOI.[49] He told Bloomberg that FairX had decided to engage in

---

[42] JX 1000.

[43] *Id.*

[44] JX 1070.

[45] *Id.*

[46] JX 1001; JX 1014.

[47] JX 1000.

[48] JX 1055.

[49] Brady Tr. 385–86.

a sale transaction, even though the Board had not even convened formally, let alone approved a sale.[50] He asked Bloomberg to return a quick pass so the Coinbase transaction could go forward.[51]

Brady told Coinbase what he was doing, but not the Board.[52] As Kapp had foreseen, Coinbase was initially concerned that Bloomberg would submit a competing bid.[53] Rather than using that concern to create competitive pressure, Brady told Coinbase not to worry.[54]

On November 3, 2021, Brady told Coinbase that Bloomberg had passed on the ROFO. Weiss learned about what Brady had done from Finnegan. Understandably frustrated, he told Brady: "Please do not take these actions until there is board consensus."[55] Brady was so out of his depth and so committed to the Revised LOI that he turned to Coinbase for "guidance on sequencing" the transaction process.[56]

---

[50] Brady Tr. 386.

[51] Brady Tr. 316; JX 1684.

[52] Brady Tr. 316; JX 123; JX 1095.

[53] JX 1041 at 3; Aggarwal Tr. 527.

[54] Aggarwal Tr. 527–28; *see* JX 1064 at 1 ("Neal was confident that he could get [Bloomberg] to decline to submit an offer within ~48 hours[.]").

[55] JX 1095; *accord* Weiss Tr. 58 ("[W]e just started talking about whether it made sense to pursue this acquisition . . . [the] ROFO had been set up . . . to help with [negotiating] leverage . . . . We hadn't even had one board meeting to discuss this.").

[56] JX 1041; *see* JX 1064.

**O. The Leadup To The Next Board Meeting**

The next Board meeting was scheduled for November 8, 2021. During the leadup, Weiss and Finnegan found themselves aligned on the need to explore the possibility of a better price. Weiss emphasized that FairX had plenty of capital and did not need a near-term deal. He cautioned against selling before the Company's impending launch of retail crypto futures. He also expressed concerns about management prioritizing a negotiation over their vesting schedules.[57] Weiss proposed a dual-track process for exploring other options: (1) hire a banker and conduct a market check, and simultaneously (2) continue to pursue the Series C round.

Finnegan advised that foregoing a competitive auction process would be "unusual in this environment," when the market was "quite frothy."[58] He emphasized that "a substantial Series C . . . with or without [Coinbase] . . . is achievable at a similar value."[59] He also noted that the capital raise could provide "significant liquidity to Management."[60] He thought they should not sell for less than $500 million.[61]

---

[57] JX 1098; Weiss Tr. 61–64.

[58] JX 1133; Finnegan Dep. 120; Weiss Tr. 67–68.

[59] JX 1133.

[60] *Id.*

[61] *Id.*; Finnegan Tr. 680–81, 686; Weiss Tr. 70.

Brady and his management team wanted to stick with the Revised LOI. They wrote of Weiss as a "lost cause," but they thought they could persuade Finnegan to support the deal.[62]

To that end, Brady's spouse drafted an email that he sent to Finnegan. In it, Brady offered a partial *mea culpa*: "I really took to heart your concerns about whether price discovery was adequately achieved . . . I would like to share some . . . proprietary information with you prior to the board meeting . . . . I think I have done you a disservice by not sharing . . . these insights earlier . . . ."[63] Brady then spoke with Finnegan, using talking points that Kapp had prepared. Finnegan initially stuck to his guns and insisted that the Company was worth $500 million, but Brady refused to go back on price. Eventually, Brady wore down Finnegan.

To ensure he wasn't missing something, Weiss wanted to contact the Company's strategic investors to obtain their perspectives on the size of the Company's market opportunity and their sense of the Company's value. By this time, the strategic investors knew about the Revised LOI. Yet after he told the Board what he planned to do, Brady, Lewis, and Kapp went ballistic. Kapp threatened Weiss with a lawsuit if he proceeded.[64] Brady and Lewis immediately reached out to those same investors to warn them about Weiss and poison the well.

---

[62] JX 1144.

[63] JX 1120.

[64] *See* JX 1152.

## P.     The November 8 Board Meeting

On November 8, 2021, the Board held its first formal meeting since FairX received the Initial LOI. Brady did not disclose that he had invited an offer. He also did not mention that he had rejected Coinbase's Series C commitment. Instead, Brady described Coinbase's offer as "unsolicited."[65]

Brady also did not report on his negotiations with Coinbase over the vesting schedules for Key Employees or his discussions with Coinbase about Bloomberg's ROFO. He did not disclose that Crypto.com had expressed interest in buying the Company or that he was scheduled to speak with its CEO on November 16. Instead, Brady gave everyone the impression that the Company did not have a good backup plan. Yet he had told Lewis exactly the opposite, and the management team believed that a deal with Crypto.com was feasible.[66]

To dissuade the Board from treating the ErisX deal as a comparable transaction for valuation purposes, Brady and Lewis told the Board that ErisX likely received a premium because it was a crypto-enabled platform, had its own Clearing License, and was backed by a consortium of investors and partners.[67] In reality, Brady and Lewis thought that FairX was more valuable than ErisX.[68]

---

[65] JX 1171 at 2.

[66] Brady Tr. 395–96; Ilyevsky Tr. 589.

[67] JX 1171.

[68] *See* Lewis Dep. 353 ("'Did you believe that FairX was more valuable than ErisX? Answer: Yes.'"); Brady Tr. 426 ("I am very much in alignment with Cliff's

Brady recommended that the Board approve the Revised LOI and pursue the Coinbase deal. To placate concerns about the deal process, he agreed to "discuss attempting to increase the purchase price with . . . Coinbase[.]"[69]

Brady went through the motions when seeking a higher price. On November 9, 2021, he told Tusar of Coinbase that he had "pain in the ass preferreds and if they could give 'a little more' that would grease it. But I said let's talk about that after we sort the process/legal points . . . and that we'll make this happen."[70] On November 11, Brady and Lewis met with Coinbase to have the price discussion that the Board wanted. Brady did not make a specific demand or propose a specific number.[71]

Coinbase got the message. They thought Brady and Lewis were "checking a box" rather than making a strong ask.[72] They also realized that the request was "really coming from FairX's preferred stockholders."[73] The Coinbase team "declined

---

views there."); JX 836 ("We have a lot more to offer than ErisX."); *see* Brady Tr. 398 (stating that that FairX was "way ahead" of ErisX); *id.* (agreeing that "ErisX's futures complex had zero volume over three years of operation.").

[69] JX 1171.

[70] JX 1207; *see* Aggarwal Tr. 537–39.

[71] Brady Tr. 330–31.

[72] JX 1230.

[73] Aggarwal Tr. 539–44; *see* JX 1230.

to increase the transaction consideration" with the expectation that the Company would execute the Revised LOI.[74]

After hearing that Coinbase held firm on price, Finnegan moved off his target price of $500 million. He concluded that the best path forward was to execute the Revised LOI.[75] Brady executed it that same day.[76]

Brady then snubbed Crypto.com. He was scheduled to speak with its CEO on November 16. Kapp advised canceling the call, lest any rumors reach Coinbase. When Brady did, Crypto.com asked to reschedule. Brady obfuscated: "Boris was going to send you a note . . . before I hit 'cancel' but must have had connectivity issues . . . . Unfortunately the next couple of weeks are going to be difficult . . . . We'll reach back out after Thanksgiving . . . ."[77] Brady never reached back out to Crypto.com. Two weeks later, Crypto.com announced that it was acquiring Small Exchange, another company in the same space as FairX.

**Q.     Brady Schemes To Remove Weiss.**

Meanwhile, Brady and his team began working with Kapp and his colleagues at DLA Piper on removing Weiss from the Board. On November 9, 2021, Lewis had

---

[74] Aggarwal Tr. 543–44.

[75] JX 1254.

[76] JX 1229.

[77] JX 1284; *see* Brady Tr. 387–88; Ilyevsky Tr. 590.

attended a strategy meeting with DLA Piper lawyers. Lewis's notes state: "Ira impuned [sic] LOI[.] Should we kick Ira off Board."[78]

Weiss irritated Brady and his allies even more when he proposed to consult with a financial advisor about valuation. On November 17, 2021, he reported to the Board that he had "identified some of the better bankers in the space" and that he would "like to reach out to them just to get an overall sense of valuation for companies like LedgerX and ErisX."[79] Kapp instructed Weiss to stop. To mollify Weiss, FairX hired Architect Partners, a boutique investment bank.[80] But Brady only gave them authority to negotiate with Coinbase within the scope of the Revised LOI.

Just before Thanksgiving, Coinbase sent FairX a first draft of a merger agreement. It called for FairX to represent that the Board approved the merger agreement unanimously.[81] Coinbase included the requirement because they knew Weiss had raised objections to the merger.[82] Lewis and Brady decided that to accommodate Coinbase, they should "kick Ira off [the] board."[83]

---

[78] JX 1197.

[79] JX 1295.

[80] JX 1325.

[81] JX 2010.0061.

[82] Aggarwal Tr. 546–49.

[83] JX 1316.

On December 1, 2021, Brady asked for Weiss's resignation. Weiss refused. FairX then asked Coinbase to modify the unanimous approval requirement. Coinbase refused and told Brady "to get that shareholder on board . . . ."[84] Kapp told them that Weiss was "very unlikely" to support the deal "unless Coinbase raises the purchase price," adding "and let me be very clear that's not what we are asking."[85]

The preferred stockholders had the power to remove Weiss. To rally support for Weiss's removal, Brady told the preferred stockholders that Weiss was "disruptive and counterproductive."[86]

On December 7, 2021, Weiss asked for books and records related to the deal negotiations. Portraying Weiss's request as proof that he was being obstructive, Brady and his team asked the preferred stockholders to remove Weiss by written consent. The preferred stockholders removed Weiss the next day. FairX then rejected Weiss's books and records demand on the theory that he was no longer a director.

Coinbase asked to be kept apprised of any further developments involving Weiss. Coinbase also pressed for a holdback from the deal consideration plus indemnification for any appraisal action so that the Selling Stockholders would be on the hook for 100% of any post-Merger litigation. FairX and the Selling Stockholders agreed.

---

[84] JX 1454 at 6.

[85] *Id.* at 5.

[86] Swanson Dep. 91; *see* Brady Tr. 332–33.

**R.     Making A Record**

In addition to removing Weiss, Brady and his team began preparing for litigation. During a strategy meeting with DLA Piper on November 9, 2021, one of the firm's Delaware lawyers raised the possibility of an appraisal proceeding and explained that Delaware appraisal decisions often use company projections in a discounted cash flow methodology.[87] Brady, Lewis, and the management team immediately recognized that the projections they had created for the Series B1/B2 round and for the aborted Series C round would support values above the deal price.[88]

After Weiss's removal, litigation seemed more likely. On January 5, 2022, Lewis circulated an email titled "Outline of Operative Reality Today."[89] Using the term "Operative Reality" was a tell. That term figures prominently in Delaware appraisal jurisprudence; it is not commonly used in other contexts.

Lewis's "Outline" described what became FairX's litigation narrative: "[I]f we didn't move ahead quickly with [Coinbase] (no . . . banker, etc.), they'd go elsewhere. If they went elsewhere, we were dead ducks . . . ."[90] Lewis also created a document called "Summary of Key Changes to FairX Operative Reality" that listed talking

---

[87] JX 1196.

[88] *Id.*; Brady Tr. 402–04.

[89] JX 1622; Brady Tr. 409–10.

[90] JX 1622 at 1.

32

points for the litigation narrative.[91] Lewis wanted FairX witnesses to say "we didn't do 'forecasts' but rather 'if/then' models," that "we really did have a deliberative process," and that the "[s]oft launch was softer than expected."[92] He also wanted FairX witnesses to say that "FTX buying LedgerX followed by . . . CBOE buying ErisX . . . [l]eft only [Coinbase] as a crypto partner option," and that "[n]one of the top tier VCs approached for Series C were interested even when we thought [Coinbase] would lead the round."[93]

Lewis's narrative omitted key events, such as the approaches by Crypto.com, Kraken, and other platforms about whether FairX was for sale. It also omitted management's belief that that FairX had other options.[94] And it failed to mention what Brady had learned about Coinbase backchannelling with Andreessen Horowitz to slow-roll the Series C round.

Management understood their marching orders. Brady and Ilyevsky began gutting the Series C projections the next day. On January 10, 2022, Brady circulated projections that reduced five-year gross revenue by ~28% and EBITDA by ~85% compared to the Series C projections.[95] The following day, Ilyevsky cut the projections

[91] *Id.* at 3.

[92] *Id.*

[93] *Id.* (formatting added).

[94] Ilyevsky Tr. 589.

[95] JX 1647.

further. His set reduced five-year gross revenue by ~59% and EBITDA by ~98% compared to the Series C projections.[96]

On January 11, 2022, the Board approved the Merger Agreement. It was executed later that day. The Board also approved the final minutes for the November 8 and 12 Board meetings. The minutes tracked Lewis's litigation narrative.

## S.    The Merger Closes.

On January 12, holders of a majority of FairX's voting power approved the Merger. On January 25, FairX disseminated an information statement to its stockholders. Anticipating that Weiss would seek appraisal, the information statement asserted that Weiss had provided substantial input to the Series C projections and emphasized that they were no longer reliable. On February 1, the Merger closed.

After closing, Coinbase managed FairX's business as the Coinbase Derivatives Exchange. Today, with the help of FairX's pre-Merger partners,[97] the business unit trades crypto futures with around $20–30 million in notional value traded daily.[98]

---

[96] JX 1648.

[97] FairX's brokers (Tradovate, Ironbeam, Stage 5), market makers (Hudson River Trading, Virtu, Budo), FCMs (StoneX), and vendors (Bookmap, CQG, Rithmic, Sierra Chart, TradingView, DXFeed) all facilitate trading volume or provide trading-related services for Coinbase's exchange. Ilyevsky Tr. 600–04; JX 587 at 2; JX 2011; PTO ¶¶ 29, 39–45.

[98] JX 2012.

Coinbase did not value and had no strategic interest in FairX's non-crypto futures business. After the Merger, Coinbase deemphasized that business and did not budget resources for it. As a result, trading volume on the platform largely ceased.

**T.      This Litigation**

On February 3, 2022, Hyde Park submitted a demand for appraisal. On April 18, 2022, Hyde Park filed this appraisal proceeding. The parties conducted discovery and litigated the case through trial.

## II.      LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings."[99] In its seminal decision on the meaning of fair value, the Delaware Supreme Court provided the following explanation:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an

---

[99] *Cede & Co. v. Technicolor, Inc. (Technicolor I)*, 542 A.2d 1182, 1186 (Del. 1988).

35

inquiry as to the value of the dissenting stockholders' interest, but must be considered . . . .[100]

The Delaware Supreme Court has adhered to that definition ever since.[101]

To determine the fair value of a stockholder's proportionate interest in the corporation, the court must "envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such."[102] When doing so, the court must value the corporation based on its "operative reality" at the time of the merger.[103] "The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had

---

[100] *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[101] *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 10 (Del. 2020) (explaining that a stockholder should be awarded "'his proportionate interest in [the] going concern'" (alteration in original) (quoting *Dell*, 177 A.3d at 21)); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–33 (Del. 2019) (per curiam) ("[F]air value is . . . the value of the company to the stockholder as a going concern," defined as the stockholder's "proportionate interest in a going concern." (internal quotation marks omitted)); *accord Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975). *But see DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 371 (Del. 2017) (describing fair value inquiry as examining whether stockholders "receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction").

[102] *Dell*, 177 A.3d at 20.

[103] *Id.*

the merger not occurred."[104] Consequently, the trial court must assess "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition."[105] The court must also value the entity "based on its business plan at the time of the merger."[106] "The time for determining the value of a dissenter's shares is the date on which the merger closes."[107]

## A.    Burdens Of Proof And The Court's Task

The appraisal statute states that "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger[] [or] consolidation . . . ."[108] That statutory language places the obligation to determine fair value squarely on the court.[109] The statutory mandate alters the burden of proof and affects the court's approach to the case.

---

[104] *Cede & Co. v. Technicolor, Inc.* (*Technicolor II*), 684 A.2d 289, 298 (Del. 1996).

[105] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999); *accord Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 217 (Del. 2010) ("[F]air value" means "the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction." (internal quotation marks omitted)).

[106] *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010).

[107] *Stillwater*, 240 A.3d at 17.

[108] 8 *Del. C.* § 262(h).

[109] *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 361 (Del. 1997).

First, because of the statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from a traditional liability proceeding. In an appraisal proceeding, "both sides have the burden of proving their respective valuation positions by a preponderance of [the] evidence."[110] "No presumption, favorable or unfavorable, attaches to either side's valuation."[111] "Each party also bears the burden of proving the constituent elements of its valuation position[,] . . . including the propriety of a particular method, modification, discount, or premium."[112]

Second, the court has to arrive at a valuation, even if none of the parties' attempts are persuasive. "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework *or to fashion its own*."[113] The Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the

---

[110] *Jarden*, 236 A.3d at 322 (cleaned up).

[111] *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989).

[112] *In re Appraisal of Stillwater Mining Co.* (*Stillwater Trial*), 2019 WL 3943851, at *18 (Del. Ch. Aug. 21, 2019) (internal quotation marks omitted), *aff'd sub nom. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020).

[113] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999) (emphasis added).

38

record."[114] Or the court "may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation."[115]

If neither party satisfies its burden, "the court must then use its own independent judgment to determine fair value."[116] As Chief Justice Strine observed while serving on this court, "I cannot shirk my duty to arrive at my own independent determination of value, regardless of whether the competing experts have provided widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance."[117] Put differently, "[w]hen . . . none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis."[118]

Contrary to the statutory language and precedent, the Selling Stockholders argue that the trial court cannot make its own valuation determination, even if it

[114] *Id.* at 526.

[115] Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38-5th C.P.S. (BNA), at A-31 (2010 & 2017 Supp.) (collecting cases).

[116] *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004); *see Gonsalves*, 701 A.2d at 361 (emphasizing the trial court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action").

[117] *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310–11 (Del. Ch. 2006).

[118] *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993).

rejects the parties' methodologies as unpersuasive. For that proposition, they rely on *Aruba*, a *per curiam* decision in which the Delaware Supreme Court reversed the trial court for deploying a valuation methodology that "neither party argued for."[119] The Selling Stockholders conclude, based on *Aruba*, that (i) the trial court cannot adopt a valuation methodology that "neither party argued for . . . as the fair value under [Section] 262" and (ii) the trial the court can only use a methodology that was "subjected to the crucible of pretrial discovery, expert depositions, cross-expert rebuttal, expert testimony at trial, and cross examination at trial."[120]

Evaluating those assertions requires considering what happened in *Aruba*. While that appraisal action was progressing through trial and post-trial briefing, the Delaware Supreme Court issued the important rulings in *DFC* and *Dell*. The trial court requested supplemental briefing after the issuance of each decision. In the supplemental brief submitted after *Dell*, the respondent argued that its unaffected trading price was the single most important marker for its fair value. In support of that proposition, the respondent cited publicly available statistics indicating that the market for its stock was efficient and asked the trial court to determine fair value using the thirty-day average of its pre-deal-announcement trading price.[121]

---

[119] *Aruba*, 210 A.3d at 140.

[120] *Id.*

[121] *Id.* at 131.

In rendering its decision, the trial court sought to incorporate the teachings of *DFC* and *Dell*. Both parties had presented DCF methodologies, but both *DFC* and *Dell* warned trial courts about the subjectivity of DCF valuations and the importance of giving weight to market-based indicators. Those admonitions applied to the DCF valuations in *Aruba*, so the trial court did not rely on them.[122]

Attempting to adhere to *DFC* and *Dell*, the trial court looked to the deal price and the unaffected trading price as market-based indicators of fair value.[123] Using the deal price as a valuation indicator meant that the trial court needed to deduct the value of the synergies allocated to the seller in the purchase price. There was no direct evidence regarding the allocation, and the parties agreed that it was not possible to determine with precision what portion of the final deal price reflected synergy value.[124] The respondent's expert conceded that the synergy allocation "cannot be accurately measured."[125] The trial court attempted to determine an appropriate synergy deduction, but regarded the figure as unreliable.[126] Believing that the unaffected trading price was a more reliable indication of standalone value, the trial

---

[122] *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc. (Aruba Trial)*, 2018 WL 922139, at *52 (Del. Ch. Feb. 15, 2018) (subsequent history omitted).

[123] *Id.* at *51–55.

[124] *Id.* at *44.

[125] *Id.*

[126] *Id.* at *53.

court used the unaffected trading price of $17.13 per share to determine fair value; the trial court did not rely on the deal-price-less-synergies metric.[127]

The Delaware Supreme Court reversed and determined fair value to be $19.10 per share, which the high court regarded as the result of a deal-price-less-synergies metric.[128] The justices remanded with instructions for the trial court to enter judgment using that amount.[129]

In addition to reversing the trial court's application of valuation principles, the Delaware Supreme Court reprehended the trial court for having "injected due process and fairness problems into the proceeding" by requesting supplemental briefing on *Dell*'s use of the unaffected trading price, noting that "the extent to which the market price approximated fair value was never subjected to the crucible of pretrial discovery, expert depositions, cross-expert rebuttal, expert testimony at trial,

---

[127] *Id.* at *54–55. The market price also has the advantage of being a valuation method that is "generally accepted in the financial community." *Weinberger*, 457 A.2d at 713. The deal-price-less-synergies method is a judicial innovation traceable to the *Union Illinois* decision. *See Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 357 (Del. Ch. 2004)

[128] *See Aruba*, 210 A.3d at 130, 131, 134, 141. In fact, the respondent had not developed that valuation indicator by starting with the deal price and deducting a synergy allocation. The respondent proceeded in the opposite direction by starting with the buyer's internal DCF valuation of $19.10 per share, then argued that by paying $24.67 per share, the buyer necessarily gave the seller over half of the synergies. *See* C.A. No. 11448, Dkt. 163 at 1, 3, 30, 41. The ostensible deal-price-less-synergies value of $19.10 per share thus was a plain vanilla DCF valuation. *See generally In re Appraisal of Regal Ent. Gp.,* 2021 WL 1916364, at *46 (Del. Ch. May 13, 2021).

[129] *Aruba*, 210 A.3d at 142.

and cross examination at trial."[130] The *per curiam* decision also reproved the trial court for adopting that methodology rather than using one of the party's methods, explaining that "[t]he reason for pretrial discovery and trial is for parties to have a chance to test each other's evidence and to give the fact-finder a reliable basis to make an ultimate determination after each side has a fair chance to develop a record and to comment upon it."[131] The Delaware Supreme Court rebuked the trial court for requesting supplemental briefing after that process was complete, then using its own valuation methodology after rejecting the alternatives that the parties advanced.[132]

The Selling Stockholders read *Aruba* broadly as holding that a trial court cannot rely on any valuation methodology that the parties themselves did not advance and which therefore was not subject to (i) "the crucible of . . . pretrial discovery and trial" and (ii) testing by the parties after "a fair chance to develop a record and comment upon it." I must take that interpretation seriously, because having served as the trial judge in *Aruba*, I have no desire to receive another dose of appellate medicine.

But I do not think that is the lesson that should be drawn from *Aruba*, because it would run contrary to the authorities that interpret Section 262(h) as requiring

---

[130] *Id.* at 139–140.

[131] *Id.* at 140.

[132] *Id.* (describing the request for supplemental briefing as "troubling" and "antithetical to the traditional hallmarks of a Court of Chancery appraisal proceeding").

that the trial court make its own valuation determination if the trial court finds that none of the parties' methodologies are persuasive. The *Aruba* decision did not cite, much less overrule, any of those precedents.

Instead, the Delaware Supreme Court seem to have been moved by "the evident plausibility of [the petitioner's] concern that the trial judge was bent on using the thirty-day average market price as a personal reaction to being reversed in a different case."[133] In response to a motion for reargument in which the petitioner advanced that charge, I issued an opinion in which I attempted to respond and explain why I used the unaffected market price.[134] The *per curiam* decision said the justices accepted my word on that point,[135] but the opinion nevertheless feels like a decision censuring the trial judge for acting improperly in that specific case. The opinion does not suggest an intent to overrule prior precedent and set out a new framework for appraisal cases in which the trial court lacks the power to make its

---

[133] *Id.*

[134] *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.,* 2018 WL 2315943 (Del. Ch. May 21, 2018). In short, after thoroughly reviewing *DFC* and *Dell* and listening to the oral arguments, I had the impression that the justices had come to view the shares' trading price as a meaningful and desirable valuation indicator, at least for a public company target in an arm's length transaction. *See id.* at \*7–15. That assessment turned out to be grossly wrong.

The *per curiam* opinion also interpreted attempts at self-deprecation as snark, such as my comment when requesting supplemental briefing on *Dell* in part because I "learned how many errors [I] made in the *Dell* matter." *Aruba,* 210 A.3d at 131. Plainly that did not land as intended.

[135] *Aruba,* 210 A.3d at 140 ("We take him at his word.")

own valuation determination. Given that context, I cannot read *Aruba* as preventing a trial court from making its own finding on valuation after the valuations the parties advance prove unpersuasive. That is what the appraisal statute requires.[136]

To bolster their reading of *Aruba*, the Selling Stockholders cite post-*Aruba* decisions which stress that the trial court must "base its fair value decision on the record made by the parties at trial."[137] That statement of law refers to the factual record that the parties have created. Even if the trial court finds the parties' valuations to be unpersuasive and adopts its own, the trial court must rely on the record that the parties created.[138] What the trial court ultimately must do is "justify its methodology (or methodologies) according to the facts of the case and relevant, accepted financial principles."[139]

---

[136] One could harmonize *Aruba* with prior precedent by envisioning that after a trial court rejected the parties' valuation positions and made its own determination, then the trial court would permit the parties to conduct supplemental discovery, followed by a supplemental hearing about the determination that the trial court made. The *Aruba* decision does not hint at that type of procedure.

[137] *Jarden*, 236 A.3d at 320, 325; *accord In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1136 (Del. 2020).

[138] That interpretation fits with one of the *Aruba* decision's principal criticisms, which concerned the trial court's request for supplemental briefing about the attributes of Aruba's common stock. *See Aruba*, 210 A.3d at 141 ("[T]he Vice Chancellor himself injected the thirty-day average market price as his own speculative idea.").

[139] *Dell*, 177 A.3d at 22 (footnote omitted).

## B. The Valuation Methodologies

When seeking to prove fair value, the parties to may rely on "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court," subject only to the statutory mandate to exclude value arising from the merger.[140] Although the appraisal inquiry might seem to involve neutral principles of valuation, "corporate finance is not law."[141]

> The appraisal exercise is, at bottom, a fact finding exercise, and . . . by functional imperative, the evidence, including expert evidence, in one appraisal case will be different from the evidence presented in any other appraisal case. Different evidence, of course, can lead to different decision paths and different outcomes.[142]

"What is necessary in any particular appraisal case is for the Court of Chancery to explain its fair value calculus in a manner that is grounded in the record before it."[143]

The company in this case is particularly hard to value. FairX was privately held, so it lacks a public market for its shares. That absence eliminates a potentially reliable valuation indicator while also making it difficult to construct valuation ratios

---

[140] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

[141] *In re Appraisal of Jarden Corp.* (*Jarden Trial*), 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *aff'd* 236 A.3d at 322.

[142] *Id.*; *accord Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016) (noting that an argument which succeeds in one case "may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively").

[143] *Jarden*, 236 A.3d at 325 (alterations and internal quotation marks omitted); *accord Stillwater*, 240 A.3d at 16.

to use in a comparable companies or comparable transactions analysis. Not only that, but the Company was still at an early stage in its growth and did not yet generate free cash flow. Making matters worse, the Company was pursuing a disruptive business model that would likely generate binary results. Either the Company would succeed brilliantly, or it would go to zero.

### 1. The Selling Stockholders' Valuation Indicia

The Selling Stockholders did not offer a specific assessment of fair value, and their position on valuation evolved over the course of the case. Their expert opined that the value of FairX was lower than the Merger consideration at the effective time, which the expert valued at $310.4 million.[144] In their pre-trial brief, the Selling Stockholders argued for a valuation "of about $154 million."[145] In their post-trial brief, they again advocated a ceiling, this time asserting that "the evidence points to a fair value of no more than ~$150 million."[146] To support that ceiling, the Selling Stockholders offered a grab bag of what they described as market-based indicators.

### a. Financing Rounds

The Selling Stockholders argue that the pre- and post-money valuations for FairX's three financing rounds represent observable market prices on which the court can rely. That type of evidence is helpful, but weak.

---

[144] JX 1939.0006; Pascarella Dep. 12.

[145] Dkt. 167 at 8, 56.

[146] Dkt. 193 at 5.

The financing rounds have the advantage of being negotiated transactions: "In a typical venture financing," the lead investor "negotiate[s] [with management] the pre-money valuation and key terms."[147] And that is the problem. Rather than bargaining first over the price, then shifting to bargaining over key terms, negotiators address both. That results in tradeoffs between the price term and non-price terms.[148] The value of the round reflects the value of the company for purposes of investors who are investing under a specific set of terms. As a result, "pre-money valuations for financing rounds are squishy."[149]

Here, the round most proximate to the valuation date was the abandoned Series C round, where FairX sought to raise capital on a pre-money valuation of around $150 million. In theory, the failure to close a particular round at a particular pre-money valuation would imply that the fair value of the company was lower than that valuation. In this case, however, Coinbase interfered with the Series C round by securing Andreesen Horowitz's agreement to slow-roll its response, and Brady took

---

[147] Spencer Williams, *Venture Capital Contract Design: An Empirical Analysis of the Connection Between Bargaining Power and Venture Financing Contract Terms*, 23 Fordham J. Corp. & Fin. L. 105, 126 (2017).

[148] *Id.* at 124. *See id.* at 125–36 (identifying key terms in a preferred stock equity financing); *id.* at 155–59 (finding empirical support for connections between price term and non-price terms).

[149] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *39 (Del. Ch. July 6, 2018) (collecting authorities and declining to treat a pre-money valuation as a "reliable indicator of value"), *aff'd Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).

the Series C round off the table when he solicited a bid from Coinbase. If Brady had instead secured a commercial agreement and Andreesen Horowitz had expressed interest, then the Company's pre-money valuation would have been much higher. Brady told Weiss in September 2021 that without Coinbase, he would target a pre-money valuation of $150 million. With Coinbase, the pre-money valuation could range from $200 million up to $400 million.

The Selling Stockholders claim that Hyde Park cannot value FairX based on a ballpark estimate tied to an uncompleted financing round that contemplated a commercial agreement that was never signed. This assertion fails to take into account the reason why FairX never secured the agreement. In a but-for world where Brady did not solicit a bid from Coinbase and take the Series C round off the table, the Company might well have secured a commercial agreement from Coinbase and raised capital at a pre-money valuation of $200 million to $400 million. The conditionality and ballpark nature of the valuation estimates weaken their evidentiary value, but they are considerations.

The Selling Stockholders look back to FairX's most recent completed round—the Series B1/B2 round in April 2021—when management negotiated a pre-money valuation of $100 million. That valuation was stale for purposes of the valuation date because, after the completion of that round, FairX hit multiple milestones, including a successful demonstration of its technology, additional broker and market-maker partners, and increasing trading volume. The Selling Stockholders contend that

FairX's value decreased between April 2021 and the valuation date, but that assertion is not credible. FairX made substantial progress over that period.

Under different circumstances, a valuation round might provide probative evidence of fair value. In this case, the Series B1/B2 round does not, and the evidentiary value of the incomplete Series C round is weak.

### b. The Small Exchange Transaction

The Selling Stockholders next point to Crypto.com's acquisition of the Small Exchange for $64 million, arguing that was a comparable transaction implying a similar valuation for FairX. The Selling Stockholders posit that even if FairX was twice as valuable, that only would imply a valuation of $128 million.

Hyde Park proved that Small Exchange was not a significant competitor for FairX and that its acquisition was not comparable. Among other things, Small Exchange pursued a traditional business model that would not disrupt CME, it offered complex products and used antiquated technology, and it had no path to offering crypto products.[150]

Crypto.com's purchase of Small Exchange supports Hyde Park's argument that Crypto.com was serious about an acquisition and could well have competed for FairX if Brady had not snubbed its CEO, but Crypto.com's acquisition of Small Exchange is not a comparable transaction. This decision does not give weight to this indicator.

---

[150] *See* JX 31 at 2–3; JX 273; JX 292 at 8; Brady Tr. 360–63; Aggarwal Dep. 53–54.

### c. Hyde Park's Internal Valuations

The Selling Stockholders next point to Hyde Park's internal valuations, observing that in December 2021, Hyde Park carried its investment in the Company at $100 million, representing the book value implied by their investment in the Series B1/B2 round. After the Merger, Hyde Park marked up the value of their investment based on the deal price, minus a 10% discount to reflect the volatility of Coinbase's common stock. The Selling Stockholders argue that the court should rely on Hyde Park's own valuations.

Hyde Park's carrying values are subject to the accounting rules and do not carry significant weight for this proceeding. Hyde Park decided to carry the investment in FairX at book value, which is permissible for accounting purposes. Those valuations did not reflect going concern value. It is possible that in another case, the court might give weight to an internal valuation, but not this time.

### d. The 409A Valuation

The Selling Stockholders next point to a Rule 409A valuation that FairX procured in April 2021. That valuation generated a figure of $40 million, which the Board approved. But the purpose of a Rule 409A valuation is to support "the exercise price for granting options and common stock to . . . employees, directors, and others to comply with IRC [Section] 409A and as an input for valuations pursuant to ASC 718 for financial reporting purposes."[151]

---

[151] JX 738 at 4.

Hyde Park's expert testified credibly that the Rule 409A valuation was both stale and unreliable. FairX hit many milestones after the issuance of the Rule 409A valuation. Also, startup companies use Rule 409A valuations to set the exercise price for stock options, and that purpose can influence the valuation output. A low exercise price, for example, increases the value of the options for employees, resulting in greater retention and incentive effects. The FairX 409A valuation of $0.59 per share suggests those incentives were in play. The Rule 409A valuation in this case is also a substantial outlier. Given these factors, the court gives no weight to the 409A valuations.

### e. The Reactions Of Sophisticated Investors

The Selling Stockholders finally point to the reactions of stockholders to a letter Weiss circulated in December 2021 in which he urged stockholders to vote against the Merger because FairX "could be worth at least $1 billion by the end of 2022."[152] The investors instead supported the Merger, suggesting that they did not place significant reliance on the projections or credit the upside case. That market indication carries some probative value, and the court relies on it when assessing fair value.

---

[152] JX 1548.

### f. The Conclusion Regarding The Selling Stockholders' Valuation Indicators

The Selling Stockholders' valuation indicators provide some evidence of value, but the collection is relatively weak. The probative value of the indicators is also undercut by (i) the evidence that the Selling Stockholders constructed a litigation narrative, (ii) their decision not to offer an affirmative valuation, and (iii) the evolution of their valuation position throughout the case. This decision gives some weight to the price talk about what could have been achieved in a Series C round if Coinbase had not interfered. This decision also gives some weight to the rejection of Hyde Park's valuation arguments by sophisticated stockholders.

### 2. Hyde Park's DCF Analysis

In contrast to the Selling Stockholders, Hyde Park offered a specific valuation based on a DCF model. That model yielded a fair value estimate of $573 million, or $19.76 per share. As the proponent of valuing the Company using that method, Hyde Park bore the burden of proving its reliability.

The DCF method is a technique that is generally accepted in the financial community. "While the particular assumptions underlying its application may always be challenged in any particular case, the validity of [the DCF] technique *qua* valuation methodology is no longer open to question."[153] It is a "standard" method that "gives life to the finance principle that firms should be valued based on the

_____

[153] *Campbell-Taggart*, 1989 WL 17438, at *8 n.11.

expected value of their future cash flows, discounted to present value in a manner that accounts for risk."[154]

The problem in this case is not with the method, but with the inputs. Without reliable projections, "any values generated by a DCF analysis are meaningless."[155] Hyde Park's expert built his DCF model on the Series C projections, which are too speculative to be reliable.

The Series C projections exhibit many of the attributes that make a set of projections reliable. "When evaluating the suitability of projections, Delaware cases express a strong preference for management projections prepared in the ordinary course of business and available as of the date of the merger."[156] As Chief Justice Strine explained while serving on this court,

> Traditionally, this court has given great weight to projections of this kind because they usually reflect the best judgment of management, unbiased by litigation incentives. That is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results.[157]

---

[154] *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

[155] *LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *18 (Del. Ch. June 30, 2015) (citation omitted); *accord* Gkatzimas Tr. 788.

[156] *Regal*, 2021 WL 1916364, at *21 (collecting authorities).

[157] *Del. Open MRI*, 898 A.2d at 332 (footnotes omitted).

That is the case here. FairX's management team did its best to prepare a reliable set of projections and pressure test them. The projections were then used in the ordinary course of business to solicit equity investments and when applying for loans from banks. Management thought the revenue assumptions and cost assumptions were reasonable. The projections also did not depend meaningfully on Coinbase. No one contemporaneously thought of the projections as speculative, inflated, or unachievable. Those arguments came later, as part of the Selling Stockholders' litigation strategy.

The difficulty lies in FairX's disruptive business model. No one had ever tried to do what FairX hoped to accomplish for retail futures trading, and FairX was a startup with no track record. Management's projections reflected how FairX would perform if everything went according to plan.

Projecting results for a new business is inherently speculative. Because of that fact, courts generally reject efforts to prove lost-profits damages for a new business that has no history of making profits.[158] This court has followed a similar practice in

---

[158] *E.g., Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. 2022) ("Delaware courts regularly refuse to award damages based on the lost profits from a new business, deeming evidence of lost profits to be too speculative, uncertain, and remote when there is no history of prior profits."); *Re v. Gannett Co.*, 480 A.2d 662, 668 (Del. Super. 1984) ("Courts have required that loss of future profits be established by substantial evidence and not be left to speculation. This requirement has given rise to a concept that as a general rule, evidence of expected profits from a new business is too speculative, uncertain and remote to be considered where there is no history of prior profits." (citations omitted)), *aff'd*, 496 A.2d 553 (Del. 1985).

appraisal proceedings by declining to credit projections for a new business without any operating track record.[159]

Likewise here, the projections that FairX management created are too speculative to use. They represent FairX's hoped-for reality, not its operative reality.

There is also ample evidence that many sophisticated investors did not credit the projections. Those investors passed on investing in the Series C round, and they later supported the Merger rather than banking on FairX's success. And Weiss admitted at trial that he thought "it was a coin flip, 50/50, as to whether FairX would make the Series C projections[.]"[160] The court therefore declines to use the DCF methodology as a valuation input.[161]

## C.     The Court's Valuation Conclusion

Without a persuasive valuation case from either side, the court must appraise the value of FairX's shares. There is one valuation input that both sides rejected: the deal price of $330 million.

In this case, neither side asks the court to consider the deal price. That was understandable. The Selling Stockholders want a result far below deal price, and

---

[159] *E.g., Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *1, 6 (Del. Ch. Apr. 13, 2012).

[160] Weiss Tr. 100.

[161] Hyde Park's expert prepared a comparable companies analysis and a precedent transaction analysis. He regarded those analyses as confirmatory support for the output of his DCF analysis. All three methodologies depended on the Series C projections. *See* Gkatzimas Tr. 812, 845, 862, 871.

Hyde Park wants a result far above deal price. The joint rejection of the deal price also makes sense because, as the Factual Background reveals, the sale process had many flaws. Importantly, however, those flaws all fell on FairX's side of the ledger. Hyde Park proved that because of those flaws, Brady left value on the table. Before considering synergies, the deal price in this case operates as a probable floor, not a ceiling.

The Selling Stockholders argue that a trial court should ignore any process failures because they do not affect standalone value. They also cite the Delaware Supreme Court's statement in *Dell* that "[t]he issue in an appraisal is not whether a negotiator has extracted the highest possible bid,"[162] as well as the justices' statement in *DFC* that fair value "does not mean the highest possible price that a company might have sold for."[163]

A court can take those admonitions into account and consider how the sale process unfolded when assessing whether a deal price provides insight into fair value. That seems particularly appropriate for a difficult-to-value company like FairX.

Because of where FairX was in its life cycle, its value depended heavily on whether a counterparty believed FairX's vision and growth story. Had it been publicly traded, FairX could have been a story stock, with its value varying more closely

---

[162] *Dell*, 177 A.3d at 33.

[163] *DFC*, 172 A.3d at 370.

tracking the level of enthusiasm for retail trading in commodity futures or crypto rather than projections of reliable cash flows.

In that sense, FairX was more like an ancient coin, a rare baseball card, or a work of art. The value of those non-cash generating assets depends on what people will pay, and what people pay depends not only on external market factors, but also how the sale process is conducted. If Sotheby's or Christie's conducts the auction, then the asset will likely generate a better price than if a local sheriff tries to sell the item on the courthouse steps. For FairX, there is a comparable difference between a thirsty and inexperienced CEO negotiating hurriedly from a position of weakness and an investment banker conducting a meaningful sale process. There is even a difference between a thirsty and inexperienced CEO negotiating against Coinbase and someone else with more experience negotiating against Coinbase. One need not try to imagine the highest price that someone might have paid to think that the price Brady secured was comparatively low.

For purposes of appraisal, using the deal-price metric also requires assessing whether any synergies affected the deal price. The court must exclude synergies because the appraisal statute mandates that the court determine the fair value of the corporation "exclusive of any element of value arising from the accomplishment or expectation of the merger."[164]

---

[164] 8 *Del. C.* § 262(h).

The Selling Stockholders did not present any evidence of synergies. Relying on its valuation expert, they argue that Coinbase must have expected substantial synergies, but no one attempted to quantify them. As the party that bore the burden of providing the amount of a synergy deduction, that omission is fatal.

The Delaware Supreme Court acknowledged in *Dell* that "[t]here may be no perfect methodology for arriving at a fair value for a given set of facts."[165] In this case, there is not a persuasive methodology for arriving at fair value. On this record, the least bad methodology is the deal price.

## D.    The Change In Value Between Signing And Closing

In an appraisal proceeding, the court must determine the fair value of the dissenter's shares as of the date on which the merger closes.[166] The valuation date is "not the date the merger agreement is executed."[167] "Thus, if the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the 'operative reality' of the corporation at the time of the merger."[168] Ordinarily, "the party seeking an adjustment to the deal price reflecting a valuation change between signing and

---

[165] *Dell*, 177 A.3d at 22–23.

[166] *Stillwater*, 240 A.3d at 17.

[167] *Solera*, 240 A.3d at 1135.

[168] *Stillwater*, 240 A.3d at 17.

closing bears the burden to identify that change and prove the amount to be adjusted."[169]

Hyde Park did not argue that FairX's fair value changed between signing and closing. The Selling Stockholders did, pointing to a decline in Coinbase's stock price that caused the value of the merger consideration to decrease from $330 million to $310.4 million. But a decline in an acquirer's stock price does not necessarily correspond to a change in the target's value, particularly when the acquirer is comparatively large and the target comparatively small.[170] Neither party made a persuasive case that the value of FairX changed between signing and closing.

## III.    CONCLUSION

The most reliable metric for determining the fair value of the petitioners' shares is the deal price of $330 million. Accordingly, the fair value of the Company as of the date of the Merger was $10.42 per share. Hyde Park is entitled to this amount, plus pre- and post-judgment interest at the legal rate, compounded monthly, with the legal rate changing from period to period with adjustments in the statutory reference rate.

---

[169] *Id.*

[170] *Cf. BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *31 (Del. Ch. Feb. 2, 2022) ("[T]he reaction of the Company's stock price to the Earnings Beat cannot be used to measure the change in the Company's value between signing and closing."); *In re PetSmart, Inc.*, 2017 WL 2303599, at *31 (Del. Ch. May 26, 2017) (declining to find a change in value between signing and closing because "short-term [changes]" were unlikely to be "indicative of a long-term trend").

The parties will submit a form of order designed to bring this case to a close at the trial court level. If there are additional issues that must be addressed, the parties will submit a joint letter identifying those issues and proposing a path for resolving them.